## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### Benton Division

| | |
|---|---|
| Marion HealthCare, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No: <u>12-CV-00871-JPG-PMF</u> |
| | ) |
| Southern Illinois Healthcare, and | ) |
| Health Care Service Corporation, d/b/a | ) |
| BlueCross and BlueShield of Illinois, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT
### Antitrust

Plaintiff Marion HealthCare, L.L.C.  brings this civil antitrust action alleging per se

violations of the federal antitrust laws and seeking damages and also to enjoin defendant

Southern Illinois HealthCare ("SIH") and defendant Health Care Service Corporation,

d/b/a "BlueCross BlueShield of Illinois" from entering into, maintaining, or enforcing

contracts preventing BlueCross BlueShield of Illinois from contracting with SIH's

competitors, including Plaintiff, in violation of Section 1 & 2 of the Sherman Act, 15

U.S.C. § 1 & 2, and Sections 2 and 3 of the Clayton Act, § 13 & 14, and to otherwise

remedy the effects of its unlawful conduct, and furthermore to prohibit Defendant Blue

Cross Blue Shield of Illinois from invoking price discrimination against Plaintiff.

Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1.      Defendant SIH has monopoly power in the relevant product market in Williamson

County and Jackson County, Illinois and the surrounding area, specifically in the areas

of: (1) the sale of general acute-care inpatient hospital services, including pediatric

services and neonatal care services (generally referred to as "hospital services") to commercial health insurers, and (2) the sale of outpatient surgical services to commercial health insurers.

SIH has an approximately 77% share of the market for inpatient hospital services sold to commercial insurers and a greater than 85.3% share of the market for outpatient services sold to commercial insurers. Most all health insurance companies in the relevant geographic market consider SIH a "must-have" hospital for health plans because it is by far the largest hospital system in the region and the only local provider of certain essential services.

2.      SIH has maintained its monopoly power in the relevant markets by entering into contracts with commercial health insurer(s), including Health Care Service Corporation, d/b/a "Blue Cross Blue Shield of Illinois" (hereafter "Blue Cross") excluding competitors in the Southern Illinois area from the insurers' health-care provider networks ("exclusionary contracts"). These exclusionary contract(s) effectively prevent insurers from contracting with other health-care facilities that compete with SIH, including Plaintiff Marion HealthCare, L.L.C.

Most patients must pay SIH substantially more for its outpatient surgical services, as compared to having the procedure performed in a freestanding outpatient setting. The effects of SIH's exclusionary contracts effectively prevent members of the public from accessing competing full service outpatient surgical services in a cost-efficient manner.

3.      SIH's exclusionary contracts constitute a per se violation of the antitrust laws and have reduced competition and enabled SIH to maintain its monopoly power in the provision of outpatient surgical services, to the detriment of the public. They have done

so by (1) delaying and preventing the expansion and entry of SIH's competitors, likely leading to higher health-care costs and higher health insurance premiums; (2) limiting price competition for price-sensitive patients, likely leading to higher health-care costs for those patients; and (3) reducing quality competition between SIH and its competitors. In this case, there is no valid procompetitive business justification for SIH's exclusionary contracts.

4.     SIH's exclusionary contracts unlawfully maintain SIH's monopoly power in the relevant markets in violation of Section 1 & 2 of the Sherman Act, 15 U.S.C. § 1 & 2 and further added to SIH's financial power and market share monopoly.  SIH's federal IRS tax returns filed November 11, 2011 show annual consolidated net patient revenues in excess of $357 million for 2010, with profits shown at line 19 (revenue less expenses) of $44,617,208.00.

5.     Defendant Blue Cross is a division of Health Care Service Corporation, a Mutual Legal Reserve Company, an independent licensee of the Blue Cross and Blue Shield Association. Blue Cross is the largest health insurance company in Illinois, providing more than 6.5 million members with health insurance coverage, including Illinois residents of Williamson and Jackson Counties and the local surrounding areas. There are approximately 12.9 Million citizens in Illinois, almost half of whom are covered by some type of Blue Cross insurance plans. Blue Cross is the dominant health insurer in Illinois and Williamson County and Jackson County, Illinois and the surrounding area. Blue Cross' net income (profit) in 2010 exceeded $1 Billion. Blue Cross total revenues in 2010 exceeded $19.6 Billion and total assets were reported as $12.7 Billion.

A report issued by the Illinois Department of Insurance for 2010 reveals Blue Cross held a dominant market share on the group health insurance market, receiving 47.76% of all premiums for insurance companies selling group health plans in the state. The next closest health insurance company competitor held a market share of 6.46% of the group health market. Blue Cross received 49.40% of all premiums of the Direct Premiums in Individual Cert. Life and P & C. A subsidiary, HCSC Insurance Services Company received another 6.27%. The report also reveals Blue Cross had a market share of 98.64% of the premiums for all insurance companies in Illinois related to direct premiums for federal employee health plans.

An article published July 17, 2012 in *Crain's Chicago Business* cites Blue Cross as holding 48.13% of the Illinois market in accident and health insurance in 2011, according to an annual report of the National Association of Insurance Commissioners. Its nearest competitor was United HealthCare of Illinois, with 10.24% of the Illinois market in accident and health insurance in 2011, according to the report.

## II. DEFENDANTS, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

6.     Defendant SIH is a nonprofit corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Carbondale, Illinois. As a non-profit corporation, Defendant SIH receives substantial benefits from Illinois taxpayers, in that it is allowed to operate its business without paying state or federal income taxes and it does not pay property taxes.

7.      Defendant Blue Cross is an Illinois business providing health insurance coverage to Illinois citizens throughout the state, including Williamson and Jackson Counties, Illinois. Blue Cross has offices throughout the state, including in Marion, Illinois.

8.      Plaintiff brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations by SIH and Blue Cross of Sections 1 & 2 of the Sherman Act,  15 U.S.C. § 1 & 2, as well as the Illinois Antitrust Laws (740 ILCS 10).

9.      This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, Section 16 of the Clayton Act, 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, and 1337(a).

10.     SIH maintains its principal place of business and transacts business in this district. SIH entered into the agreements at issue in this District, and committed the acts complained of in this District. SIH's conduct has had anticompetitive effects and will continue to have anticompetitive effects in this District. Blue Cross maintains an office in this district and transacts business in this District. Blue Cross' conduct has anticompetitive effects in this District. Consequently, this Court has personal jurisdiction over the defendants, and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.

11.     SIH is engaged in, and its activities substantially affect, interstate trade and commerce. It contracts with governmental and commercial health insurers located inside and outside of Illinois to be included in their provider networks. These providers of governmental and commercial health insurance make substantial payments to SIH in interstate commerce. Blue Cross is engaged in, and its activities substantially affect,

interstate trade and commerce. Blue Cross contracts with health care providers in Illinois for the purpose of developing provider networks.

### III. RELEVANT MARKETS

### A. Relevant Product Markets

**1) The sale of inpatient hospital services to commercial health insurers**

12.      The sale of inpatient hospital services to commercial health insurers is a relevant product market.

13.      Inpatient hospital services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient. Inpatient hospital services *exclude* (1) services at hospitals that serve solely children, military personnel or veterans; (2) services at outpatient-only facilities that provide same-day service only; and (3) psychiatric, substance abuse, and rehabilitation services. Although individual inpatient hospital services are not substitutes for each other (*e.g.*, pediatric, obstetrics and cardiac services are not substitutes for each other), the various individual inpatient hospital services can be aggregated for analytic convenience.

14.      The market for the sale of inpatient hospital services to commercial health insurers excludes outpatient services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase. There are no other reasonably interchangeable services for inpatient hospital services.

15.      Commercial health insurers include managed-care organizations (e.g. Blue Cross Blue Shield of Illinois, HealthLink, Aetna, United Healthcare, Health Alliance, CIGNA, or other HMOs or PPOs), rental networks (such as HealthLink), and self-funded plans.

Rental networks serve as a secondary network used by health insurance companies looking for network coverage or discounts outside of their own networks or by self-insured employers; they are used by small and mid-sized health insurance companies to offer clients national coverage. Self-funded plans may access provider networks through managed-care organizations or rental networks. Although not all of these are risk-bearing entities, they can be referred to collectively as "commercial health insurers." Commercial health insurers *do not* include government payers (Medicare, Medicaid, and TRICARE).

16.     The market for the sale of inpatient hospital services to commercial health insurers *excludes* sales of such services to government payers. The primary government payers are the federal government's Medicare program (coverage for the elderly and disabled), the joint federal and state Medicaid programs (coverage for low-income persons), and the federal government's TRICARE program (coverage for military personnel and families). The federal government sets the rates and schedules at which the government pays health-care providers for services provided to individuals covered by Medicare, Medicaid, and TRICARE. These rates are not subject to negotiation.

17.     In contrast, commercial health insurers negotiate rates with health-care providers and sell health insurance policies to organizations and individuals, who pay premiums for the policies. Generally, the rates that commercial health insurers pay health-care providers are substantially higher than those paid by government payers (Medicare, Medicaid, and TRICARE). Additionally, the state of Illinois contracts for the purchase of commercial health insurance for employees employed by the state, including among other individuals, state workers, teachers, lawmakers, judges, and a host of other individuals.

18.     There are no reasonable substitutes or alternatives to inpatient hospital services sold to commercial health insurers. A health-care provider's negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payers, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for inpatient hospital services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of inpatient hospital services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

**2) The sale of outpatient surgical services to commercial health insurers**

19.     The sale of outpatient surgical services to commercial health insurers is a relevant product market.

20.     Outpatient surgical services are a broad group of surgical diagnostic and surgical treatment services that do not require an overnight stay in a hospital. Outpatient surgical services are typically performed in a hospital or other specialized facility, such as a free-standing ambulatory surgery center that is licensed to perform outpatient surgery. Outpatient surgical services are distinct from procedures routinely performed in a doctor's office. Outpatient surgical services *exclude* inpatient services at hospitals or other facilities that serve solely children, military personnel, or veterans. Although individual outpatient surgical services are not substitutes for each other (*e.g.*, orthopedic

8

and gastroenterological surgical services are not substitutes for one another), the various individual outpatient surgical services can be aggregated for analytic convenience.

21.     The market for the sale of outpatient surgical services to commercial health insurers excludes inpatient hospital services, because health plans and patients would not substitute inpatient care for outpatient surgical services in response to a sustained price increase. There are no other reasonably interchangeable services for outpatient surgical services. As an example, freestanding ambulatory surgical centers cannot provide inpatient hospital services. Essentially, ambulatory surgical centers only provide outpatient surgical services.

22.     There are no reasonable substitutes or alternatives to outpatient surgical services sold to commercial health insurers. A health-care provider's negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payers, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for outpatient surgical services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance. Consequently, a hypothetical monopolist provider of outpatient surgical services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

## B. Relevant Geographic Market

23.     The relevant geographic market for each of the relevant product markets alleged above is Williamson and Jackson Counties, Illinois and portions of the adjacent local geographic areas in close proximity to these two counties. The vast majority of patients residing in Williamson and Jackson Counties primarily utilize hospitals in these two counties when hospital inpatient care is required, as opposed to leaving the area to receive inpatient hospital care outside these counties. Similarly, the vast majority of patients residing in Williamson and Jackson Counties utilize outpatient surgical services from facility providers located in these two counties, rather than traveling out of those counties for outpatient surgery.  Geographically, citizens in Williamson and Jackson Counties have the option to receive inpatient care within the two-county area, or be forced to drive in excess of an hour or more to hospitals located outside the region for alternative care. The great majority of citizens in Williamson and Jackson Counties receive hospital treatment locally at one of the four hospitals in the two-county area. Portions of the population of counties in close proximity to Williamson and Jackson County also utilize the hospital services in the two-county area. There are certainly no "bright line" demarcation boundaries delineating geographic market borders in the field of healthcare, beyond which patients seek medical care in other locations. Artificial county line boundaries do not adequately delineate geographic market borders in healthcare.  For purposes of this complaint, the relevant geographic market is no larger than Williamson and Jackson Counties and populations in border counties in close proximity to those two counties.

24.     According to the 2010 estimates of the Census Bureau, Jackson County, Illinois has a population of about 60,218. Williamson County, Illinois has a population of about 66,357. Citizens from many local surrounding rural counties also utilize healthcare services in both Williamson and Jackson Counties. It is likely the population of citizens in the relevant geographic market exceeds 200,000 people.

25.     Commercial health insurers contract to purchase inpatient hospital services and outpatient surgical services in the geographic area in which their health plan beneficiaries are likely to seek medical care. Health plan beneficiaries typically seek medical care close to their homes or workplaces. Relatively few plan beneficiaries who live in the Illinois counties of Jackson County and Williamson County and the local surrounding geographic area in close proximity to these two counties travel outside its borders to seek inpatient hospital services or outpatient surgical services. Commercial health insurers that sell policies to beneficiaries in Jackson County and Williamson County and the local surrounding geographic area in close proximity to these two counties cannot reasonably purchase inpatient hospital services or outpatient surgical services outside Jackson County and Williamson County as an alternative to serve those beneficiaries. Consequently, hospitals and health-care facilities outside Jackson County and Williamson County do not compete with health-care providers located in Jackson County and Williamson County for the sale of the relevant products in a manner that would constrain the pricing or other behavior of Jackson County and Williamson County healthcare providers.

26.     Competition for the sale of inpatient hospital services to commercial health insurers from providers located outside Jackson County and Williamson County would

11

not be sufficient to prevent a hypothetical monopolist provider of inpatient hospital services to commercial health insurers located in the Jackson County and Williamson County and the surrounding geographic area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

27.     Competition for the sale of outpatient surgical services to commercial health insurers from providers located outside Jackson County and Williamson County would not be sufficient to prevent a hypothetical monopolist provider of outpatient surgical services in Jackson County and Williamson County from profitably maintaining supracompetitive prices for those services over a sustained period of time.

### IV. HOSPITALS AND OUTPATIENT SURGICAL FACILITIES IN THE WILLIAMSON AND JACKSON COUNTY, ILLINOIS AREAS

### A. Acute-Care Hospitals

28.     There are four general acute-care hospitals in Jackson County and Williamson County –

     (a) Memorial Hospital of Carbondale (owned by SIH),

     (b) Herrin Hospital in Herrin (owned by SIH),

     (c) St. Joseph Memorial Hospital in Murphysboro (owned by SIH)

     (d) Heartland Regional Medical Center (owned by Community Health Systems)

#### a) Memorial Hospital of Carbondale

29.     Memorial Hospital of Carbondale is an approximately 132-bed facility located in Carbondale, Illinois. It is the largest SIH facility and serves southern Illinois as a regional medical center. It is a general acute-care hospital that offers a wide range of inpatient and outpatient services. Memorial Hospital of Carbondale has 8 surgical operating rooms, 2

endoscopy rooms, a laboratory, a 24-hour emergency department, a pediatric unit, and neonatology services among other services. It offers comprehensive cardiac care and has a childbirth center. SIH offers the only Level II-plus neonatal intensive care unit south of Springfield, Illinois, and the only pediatric unit in southern Illinois. Memorial Hospital of Carbondale is a private nonprofit hospital, and is not a public hospital.

30.     Commercial health insurers that offer health insurance within Jackson County and Williamson County and the surrounding geographic area consider Memorial Hospital of Carbondale a "must have" hospital because it is by far the largest hospital system in the region and the only provider of some essential services, such as neonatology, pediatrics, and sub-specialty cardiac surgery.

31.     Memorial Hospital of Carbondale also has an affiliation with Southern Illinois University's Medical School through its Family Practice Residency Program.

### b) Herrin Hospital

32.     Herrin Hospital is a 114-bed general acute-care hospital that has been in operation since 1913. It is owned by SIH and it is also a not-for-profit facility.  Herrin Hospital offers a wide range of services including inpatient and outpatient surgical services, 4 surgical operating rooms, 2 endoscopy rooms, a laboratory, and a 24-hour emergency department. Herrin Hospital operates a chest pain center and is a feeder hospital for cardiovascular services to Memorial Hospital of Carbondale.

### c) St. Joseph Memorial Hospital

33.     St. Joseph Memorial Hospital in Murphysboro is a 25-bed critical access hospital located in Murphysboro, Illinois. The facility is owned by SIH and was acquired by SIH

in 1995. It is a feeder hospital for services to Memorial Hospital of Carbondale. It is a

not-for-profit facility, as well.

### d) Heartland Regional Medical Center

34.    Heartland Regional Medical Center ("Heartland") is a for-profit facility owned by

Community Health Systems, Inc., a publicly traded company on the New York Stock

Exchange (symbol-"CYH"). Heartland is a 92-bed facility located in Marion, Illinois.

### B. Outpatient Surgical Facilities

35.    Memorial Hospital of Carbondale, Herrin Hospital, St. Joseph Memorial Hospital

and Heartland Regional Medical Center are four hospitals in Williamson and Jackson

County that provide outpatient surgical services, albeit in a hospital setting.  Marion

Surgery Center, Ltd., located in Marion, Illinois, provides outpatient surgical services in a

non-hospital setting focusing primarily on ophthalmology procedures and some pain

remediation procedures. Pain Care Surgery Center, located in Marion, Illinois, provides

outpatient surgical services in a non-hospital setting and only performs pain remediation

surgeries. Physicians' Surgery Center, L.L.C. is located in Carbondale, Illinois and is

majority-owned by SIH.  It provides outpatient surgical services in a non-hospital setting.

Southern Illinois Orthopedic Center, LLC, a single specialty orthopedic outpatient

surgical facility, performs only orthopedic procedures, and is partially owned by SIH.

Plaintiff Marion HealthCare, L.L.C. is a multi-specialty licensed surgery center located in

Marion, Illinois.

36.    Plaintiff Marion HealthCare, L.L.C. is a multi-specialty freestanding outpatient

surgery center offering outpatient surgical services to residents of Williamson County

and Jackson County, and the local surrounding area. Plaintiff's surgery center was first

developed in 2001, when it submitted an application to the Illinois Health Facilities Planning Board, Project #01-076, seeking a state permit to construct an outpatient surgical facility. Plaintiff offered Defendant SIH an opportunity to become an owner-investor in Project #01-076, but Defendant chose instead to oppose the project.

On January 15, 2002, Defendant SIH formally requested a public hearing from the Illinois Health Facilities Planning Board for the purpose of submitting testimony opposing Plaintiff's project #01-076. The public hearing was held on January 31, 2002. Defendant SIH formerly opposed Plaintiff's application, submitting both oral and written testimony at the hearing in opposition to the project.

The Illinois Health Facilities Planning Board issued Plaintiff a Certificate of Need permit to construct an outpatient ambulatory surgery center. The facility was constructed and thereafter received a state license from the Illinois Department of Public Health. The facility subsequently opened for business, performing its first surgical case April 9, 2004.

Defendant SIH maintains an ownership interest in two competing surgery centers that compete with Plaintiff's surgery center. On information and belief, SIH maintains ownership in Southern Illinois Orthopedic Center, LLC and Physicians' Surgery Center, L.L.C.

### C. Potential Expansion by Competitors

37.    On information and belief, based on verbal and written communications with representatives of Health Care Service Corporation, aka Blue Cross/Blue Shield of Illinois, SIH has included in its contract with Blue Cross/Blue Shield of Illinois, an exclusionary contract prohibiting Blue Cross/Blue Shield of Illinois from contracting with Plaintiff Marion HealthCare, L.L.C.

On October 11, 2011, Blue Cross representative Brenda Lane orally informed Marion HealthCare, L.L.C. that Blue Cross had an exclusive contract with SIH which prohibited Blue Cross from contracting with Marion HealthCare, L.L.C. surgery center or other competing outpatient surgery centers.

On October 20, 2011, at 11:34AM, in an e-mail communication, Blue Cross representative Brenda Lane informed Marion HealthCare, L.L.C. it was precluded from entering into an agreement with Marion HealthCare, L.L.C. based on language in Blue Cross' hospital agreement with SIH.

38.     On information and belief, Plaintiff believes SIH may have additional exclusionary contracts in place with other commercial insurers prohibiting contracts with Marion HealthCare, L.L.C.

39.     Marion HealthCare L.L.C. has additional capacity to provide services to the Illinois residents of Williamson and Jackson counties and local surrounding geographic regions, but for the exclusive contracts in place between SIH and Blue Cross/Blue Shield of Illinois, and possibly other insurance plans. On multiple occasions, Marion HealthCare, L.L.C has attempted to obtain in-network status with Blue Cross/Blue Shield of Illinois, without success. Blue Cross has refused to contract with Marion HealthCare, L.L.C. citing its exclusive contract with SIH as prohibiting a contract with any competing surgery centers.

### V. SIH'S MONOPOLY POWER

40.     SIH has monopoly power in the two relevant product markets in the Williamson and Jackson County area, as well as surrounding geographic counties, including the product markets: (1) the sale of inpatient hospital services to commercial health insurers

16

and (2) the sale of outpatient surgical services to commercial health insurers. SIH has dominated both product markets in the Williamson and Jackson Counties area, as well as surrounding geographic counties, and its prices have climbed.  Additionally, over the past several years, SIH has embarked on a plan to purchase, acquire and otherwise control independent healthcare providers in the region, with a purpose of controlling the referral of patients in the market. SIH continues to attempt to strengthen its monopoly by purchasing independent physician practices, including surgeons, primary care physicians, nurse practitioners and physician assistants further establishing its monopoly power in the geographic market.

### A. Inpatient Hospital Services

41.     SIH is by far the largest provider of inpatient hospital services in the Williamson and Jackson Counties area, as well as surrounding geographic counties. Per verified hospital data from the Illinois Department of Public Health CY 2010, SIH's market share of inpatient hospital services in the Williamson and Jackson Counties area is estimated as follows:

a. SIH has a 77% market share of the total hospital inpatients covered by commercial insurance.

b. SIH has 80.6% market share of Inpatient Revenue received from patients covered by commercial insurance. Total net inpatient revenue from commercial payers in the region was $76,576,268 and SIH net inpatient revenue was $61,700,692.

c. Collectively, considering total inpatients and total outpatients served who were covered by private commercial insurance, SIH had a market share of 85% for all patients covered with insurance.

d. SIH had a 72.3% market share of admissions and 75% market share of total inpatient days.

e. SIH had a 68.6% market share of total births

f. SIH had a 77% market share of inpatient surgical cases

### B. Outpatient Services

42.    SIH is also by far the largest provider of outpatient services in the in the Williamson and Jackson Counties area. Per certified data from the Illinois Department of Public Health CY 2010, SIH's market share of outpatient hospital services includes:

a. SIH has a 76% market share of the outpatient surgical cases at hospitals in Williamson and Jackson Counties, performing 5428 outpatient surgical cases of the 7127 total outpatient surgical cases

b. SIH has a 96% market share of outpatient procedure room utilization for gastrointestinal (GI) procedures, performing 6089 GI procedures out of the 6344 GI procedures performed in hospital procedure rooms in Williamson and Jackson Counties.

c. SIH has an 85.3% market share of the total outpatients served with commercial insurance, serving 99,168 patients of the total 116,230 patients covered with commercial insurance.

d. SIH has 82.1% of the market share of outpatient revenue received from Commercial Private Insurance payers, receiving $131,164,280 of the total $159,774,668

e. SIH has 81.5% of the market share of total outpatient visits by hospital providers in Williamson and Jackson Counties, Illinois, with 260,191 outpatients visits out of the 319,156 total outpatient visits.

43.     SIH, through its wholly owned subsidiary Southern Illinois Medical Services (SIMS), recently acquired 30+ healthcare providers when it purchased Carbondale Clinic in Carbondale, Illinois. It acquired 20 healthcare providers when it purchased Logan Primary Clinic November 1, 2011, and on information and belief it exclusively leases the services of Prairie Cardiovascular cardiology for cardiology services in the market. On information and belief, SIMS has 128 providers in 18 different specialties holding a strongly dominant position in the medical services market, including referrals for outpatient surgery.  On information and belief, SIMS contracts with and/or employs healthcare providers, paying them far above fair market value for their services, incurring millions of dollars of losses annually, and subsidizing its losses by using its not-for-profit tax exempt status, with the purpose of monopolizing the healthcare market, including the outpatient surgery market.

## VI. SIH HAS WILLFULLY MAINTAINED ITS MONOPOLY POWER THROUGH THE USE OF ANTICOMPETITIVE EXCLUSIONARY CONTRACTS

### A. The Exclusionary Contracts and Their Terms

44.     On information and belief, SIH requested and obtained exclusionary language in its contracts with some commercial insurance companies, including Blue Cross/Blue Shield of Illinois ("Blue Cross"), prohibiting Blue Cross from contracting with competing non-SIH ambulatory surgery centers, including Plaintiff Marion HealthCare, L.L.C.

SIH has improperly and illegally tied its inpatient hospital services with its outpatient surgical services including exclusionary requirements prohibiting Blue Cross from contracting with competing freestanding outpatient surgery centers in the region.

The tying product is the inpatient hospital services and the tied product is exclusive contracting for outpatient surgical services.

45.     SIH's improper conduct induces commercial insurers such as Blue Cross to exclude competing outpatient surgery centers from entering the healthcare market to compete with SIH for outpatient surgical services.

46.     SIH adopted the exclusionary contracts in direct response to the competitive threat presented by Marion HealthCare, L.L.C.'s surgery center to SIH's monopoly position in the outpatient surgical market.

47.     SIH developed its exclusionary contracts to maintain its monopoly in the outpatient surgical market and there is no valid business purpose for the exclusionary contracts, except to prohibit competition.

48.     SIH has used its 501(c) (3) not-for-profit status and its exemption from federal income taxes, including revenues garnered from state and federally subsidized healthcare programs to reduce, restrict, and attempt to eliminate competing healthcare businesses to the detriment of the public.

49.     Generally, commercial insurers prefer and the general public benefit from an open network of potential healthcare providers, in which patients have a choice of hospitals and outpatient surgical facilities. Notwithstanding a preference to maintain an open network, when insurers are faced with a hospital provider who holds a monopoly on certain healthcare services, insurers are induced to acquiesce to exclusivity demands. In return, insurers may be granted discounts for inpatient hospital service rates from hospitals like SIH who hold monopoly power in certain healthcare markets.

50.     On information and belief, SIH may have entered into exclusionary contracts with more than one commercial health insurers currently providing health insurance to residents of the Williamson and Jackson County, Illinois area.

### B. SIH's Exclusionary Contracts Foreclose its Rivals from the Most Profitable Health-Insurance Contracts.

51.     SIH has effectively foreclosed Marion HealthCare, L.L.C. from profitable health-insurance contracts for outpatient surgical services in the Williamson and Jackson County, Illinois area and such contracts that are crucial for its rivals to effectively compete.

52.     Inclusion in health insurer networks is critical because patients generally seek health-care services from "in-network" providers and thereby incur substantially lower out-of-pocket costs than if the patients use out-of-network providers. Patients do so because, typically, a health insurer charges a member substantially lower co-payments or other charges when the member uses an in-network provider.

53.     By effectively denying its competitors critical in-network status, SIH and Blue Cross have substantially reduced the number of patients who would otherwise use Marion HealthCare, L.L.C. for outpatient surgical services. More importantly, SIH's exclusive contracts effectively deny access to a substantial percentage of the most profitable patients—those with commercial health insurance.

54.     It is substantially more profitable for hospitals to serve patients with commercial health insurance than Medicare, Medicaid, or TRICARE patients, because government plans pay significantly less than commercial health insurers. This is true in the Williamson and Jackson County, Illinois area. Virtually all commercial health plans in

the Williamson and Jackson County, Illinois area pay SIH substantially more than the Medicare and Medicaid payment rates.

55.     Consequently, patients covered by government plans are not adequate substitutes for commercially insured patients. In fact, SIH, like many other hospitals, depends on payments from commercial health insurers to compensate for the comparatively low payments it receives from government payers. The low payment rates from government payers provide little or no contribution margin to offset SIH's overhead expenses.

56.     Payments from Blue Cross to SIH as a result of its exclusionary contract accounted for a substantial portion of all payments that SIH received from commercial health insurers.

57.     Because the insurers that have exclusionary contracts with SIH pay rates much higher than governmental programs such as Medicare and Medicaid, these insurers account for a substantial share of the profits that would otherwise be available to competing health-care providers.

58.     If the commercial health insurers that have exclusionary contracts with SIH added Marion HealthCare L.L.C. to their networks, Marion HealthCare L.L.C. would earn substantially higher profits than they do now.

### C. SIH's Exclusionary Contracts Likely Have Caused Substantial Anticompetitive Effects.

59.     SIH's exclusionary contracts have reduced competition and enabled SIH to maintain its monopoly power in the provision of inpatient hospital services and outpatient surgical services. By effectively preventing Blue Cross from including in its network other outpatient facilities, such as Marion HealthCare, L.L.C. surgery center, SIH has:

(1) delayed and prevented the expansion and entry of SIH's competitors, likely leading to higher health-care costs and higher health insurance premiums;

(2) limited price competition for price-sensitive patients, likely leading to higher health-care costs for those patients;

(3) reduced quality competition between SIH and its competitors;

(4) reduced the likelihood patients will be treated at Marion HealthCare, L.L.C. surgery center; and

(5) reduced the healthcare options for patients in need of outpatient surgery.

**1)  The exclusionary contracts likely delayed and prevented expansion and entry.**

60.     The exclusionary contracts have likely delayed and prevented competitors from expanding in or entering the relevant markets, leading to higher health-care costs and higher health-insurance premiums. As alleged above, SIH's exclusionary contracts effectively prevent large commercial health insurers such as Blue Cross from contracting with competitors of SIH's outpatient surgery facilities. If SIH had not imposed its exclusionary contracts, Blue Cross likely would have contracted with Marion HealthCare, L.L.C. surgery center (and with providers that otherwise might have entered the market), giving the competitors in-network access to the patients covered by commercial health insurers—the patients that are the most profitable to health-care providers.

61.     Furthermore, physicians treating patients covered by commercial health insurers that have been effectively prevented from contracting with SIH's competitors would likely have referred more patients to these competitors, and more patients would likely have chosen to use them. In addition to referrals of patients insured by commercial health insurers with exclusionary contracts, such referrals would have likely included additional

referrals of Blue Cross patients and patients covered by Medicare, Medicaid, and TRICARE. Many doctors engage in "block-booking," finding it most efficient to perform all of a given day's surgeries and other procedures at the same facility. This, in turn, would have given SIH's competitors higher patient volumes and utilization, increased revenues, and substantially higher profits.

62.     The higher volumes and profits obtained from serving additional patients insured by commercial health insurers, the patients that are the most profitable to health-care providers, as well as additional Medicare, Medicaid or TRICARE patients, likely would have allowed Marion HealthCare, L.L.C. and other competitors to expand. This expansion would enable the competitors to compete more effectively with SIH, likely resulting in more competition and lower health-care costs.

63.     Plaintiff Marion HealthCare, L.L.C. surgery center has considered expansion into additional services on numerous occasions, including breast cancer screening and diagnostic services, but has been limited in its ability to expand due to its lack of in-network access to commercially insured patients covered by Blue Cross insurance. Marion HealthCare, L.L.C. also would likely fill its significant excess capacity for the services it already provides if it had access to the commercial health insurers that currently have exclusionary contracts with SIH.

64.     Blue Cross has actively attempted to thwart Marion HealthCare, L.L.C.'s expansion in the market place by sending threatening letters via certified mail to local physicians, threatening those physicians that their individual Blue Cross provider contracts would be terminated if they continued to utilize out-of-network Marion HealthCare, L.L.C. surgery center, notwithstanding the fact Blue Cross has entered into

24

an exclusive contract with SIH which prohibits Marion HealthCare, L.L.C. from

becoming an in-network provider.

65.     The lack of in-network access to commercially insured patients has also

detrimentally affected Marion HealthCare, L.L.C.  because commercial insurers routinely

inform patients in need of outpatient surgical services they must use an in-network

provider or face substantially higher out-of-pocket fees, co-pays and deductibles.

Additionally, large insurance companies routinely send letters and communications to

physicians threatening them that they risk being excluded from the insurance company's

in-network status if they do not utilize in-network outpatient surgical facilities.  Blue

Cross has informed area physicians and patients Marion HealthCare, L.L.C. surgery

center is out-of-network, notwithstanding the fact Blue Cross refuses to contract with the

facility based on its exclusive contract with SIH.

66.     SIH's exclusionary contracts also inhibit new providers from entering the market.

Potential entrants are dissuaded from entering the market because they cannot obtain

contracts with commercial health insurers who have customers in that market.  SIH's

exclusionary contracts currently prevent such access.

67.     By limiting the expansion or entry of competitors, SIH's exclusionary contracts

have helped it to maintain its monopoly and likely increased the cost of providing

medical care to residents in the Williamson and Jackson County area and local

surrounding areas. Because the exclusionary contracts likely limited competitors'

expansion and entry, and thereby reduced insurers' bargaining leverage with SIH, the

contracts likely have enabled SIH to continue to demand higher prices from commercial

health insurers free from competitive discipline.

68.     The costs of medical care are typically 80% or more of an insurer's costs, and hospital inpatient costs are a substantial portion of medical care costs. The price of hospital inpatient services at individual hospitals directly affects health insurance premiums for the customers that use those hospitals. Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices.

69.     On information and belief, SIH's outpatient surgery costs are substantially higher than similar services provided by comparable non-SIH outpatient surgical facilities. The higher payment rates demanded by SIH from commercial health insurers are borne in part by local area employers and residents in the form of higher insurance premium.

**2) The exclusionary contracts likely have limited price competition for price-sensitive patients.**

70.     The exclusive contract between Blue Cross and SIH has likely reduced competition for price-sensitive patients in the relevant markets. Certain patients select a hospital based on price because the prices charged can affect the patient's out-of-pocket costs. Exclusionary contracts effectively prevent insurers from including providers such as Marion HealthCare, L.L.C. in commercial health insurers' network. This makes it less likely that a commercially insured patient would switch to Marion HealthCare in response to a price increase by SIH, and hence reduce this constraint on SIH's prices. Consequently, the exclusionary contracts likely enable SIH to charge higher prices for many services.

Depending upon the specific procedure being performed, facility fees for outpatient surgery performed at Defendant SIH hospitals is on average substantially more expensive than having a similar procedure performed at Marion HealthCare, L.L.C. For

example, on information and belief, outpatient surgical facility fees at Memorial Hospital in Carbondale ("Memorial") for laparoscopic gall bladder surgery, ranges between $19,906.00 up to $34,314.00. Facility fees for a colonoscopy at Memorial vary between $4,559.00 up to $21,705.00. These are substantially higher than similar fees at Marion HealthCare, L.L.C.

State of Illinois, Department of Public Health Charge data ("Charge Data") through September, 2011 indicates Memorial charges over six thousand dollars more per procedure for a breast lumpectomy, traditionally performed for localized breast cancer. State data reveal Memorial's charges average $13,003 for the procedure while Plaintiff's average charges are $6,984. Similar Charge data for pediatric tonsillectomy reveal average charges at Memorial of $10,152, at SIH's Herrin Hospital $12,959, and averages at Plaintiff's facility are $4731, less than half the price at SIH's two hospitals. Average Bunionectomy charges at Memorial are more than $10,000 above Marion HealthCare's facility. Memorial's charges for pediatric myringotomy (ear) tube insertion are 25% higher than similar service charges at Marion HealthCare ($7,773 vs. $5,723)

The exclusionary contracts have likely caused some patients to defer, postpone or forgo entirely recommended procedures, e.g. colon cancer screening, as a result of the higher prices due to the monopoly created by the exclusive contract language. It is likely some patients have chosen to entirely forgo colon cancer screening or other procedures rather than paying the higher charges associated with undergoing the procedure at an SIH hospital.

Patients covered by Blue Cross insurance who choose to proceed with cancer screenings are forced to incur greater charges and expenses at in-network hospitals as

compared to having the procedures performed at Marion HealthCare. As an example,

Michael D. Phillips is a resident of Marion, Williamson County, Illinois. He is an

employee of the city of Marion and covered by Blue Cross insurance. He was advised of

the need to undergo a cancer screening colonoscopy and esophagogastroduodenoscopy

(EGD) in 2011. Mr. Phillips has consented to have his health information publicly

included in this complaint. He inquired about the possibility of undergoing the procedure

at Marion HealthCare, L.L.C. but was informed by Blue Cross that since the facility was

out-of-network it would cost him more money to have it done at an out-of-network

facility. Due to these representations, on July 12, 2011 Mr. Phillips had the procedures

performed at an in-network hospital facility. The facility charges for the colonoscopy and

EGD procedures were $12,222.92 and Mr. Phillips' out-of-pocket portion of the bill was

$3,491.17. Marion HealthCare, L.L.C.'s facility charges for the exact same procedures

would have been $6,511.39, or about 47% less than the in-network facility amount

($12,222.92), yet Mr. Phillips was forced to pay substantially more for the procedures

because of SIH's exclusive contract with Blue Cross.

**3) The exclusionary contracts likely have reduced quality competition between SIH and its competitors.**

71.    Patients and physicians often choose among hospitals and other health-care

providers based on the provider's quality and reputation, including quality of care

(reflected in past performance on clinical measures such as morbidity and mortality rates)

and quality of service (reflected in non-clinical characteristics that may appeal to patients,

including amenities such as physical surroundings, staff hospitality, and other services).

Because there is a financial penalty for using out-of-network providers, patients with

health insurance provided by insurers with exclusionary contracts are less likely to choose out-of-network providers, even if the patient believes the out-of-network provider offers superior quality to SIH.

72.     If SIH's competitors became in-network providers for more commercially insured patients, each of those competitors would have the incentive to make additional improvements in quality to attract those patients to its facility. SIH, in turn, would also have the incentive to improve its quality in order to keep patients from choosing Marion HealthCare or another competitor. Therefore, without the exclusionary contracts, SIH and its competitors would have increased incentives to make additional quality improvements, and the overall level of quality of health care in Williamson County and Jackson County and surrounding areas likely would be higher. Moreover, such quality improvements would benefit all patients, not just those with commercial health insurance.

73.     Blue Cross has actively attempted to steer physicians and patients away from Marion HealthCare, L.L.C. by sending local physicians threatening written communications via certified mail and threatening those physicians that their Blue Cross provider contract would be terminated if they continued to utilize Marion HealthCare surgery center.  These letters have been sent regardless of the high quality care provided by Marion HealthCare, L.L.C.

### D. The Exclusionary Contracts Have Likely Driven Up the Cost of Outpatient Surgical Services for the Community.

74.     By decreasing the available outpatient surgical options for the community, the exclusionary contracts have decreased competition in the geographic market.

75.     This decrease in competition has allowed SIH to charge patients in the community higher prices for outpatient surgical services than if there was unfettered competition.

76.     Because Marion HealthCare surgery center is an out-of-network provided, even if a patient covered by Blue Cross insurance desires to have surgery at Marion HealthCare, L.L.C., the patient will pay higher out-of-pocket expense if the patient has surgery at the facility.

77.     Blue Cross improperly invokes price discrimination against Marion HealthCare, L.L.C. by arbitrarily decreasing the "allowable" amounts paid for surgical services if and when a patient chooses an out-of-network facility. e.g. If a patient has surgery at an in-network facility, Blue Cross has a set established "allowable" facility fee for which it reimburses the in-network facility. In contrast, if a patient receives surgery at an out-of-network facility, Blue Cross improperly decreases the "allowable" amount for the facility fee, merely because the facility is out-of-network, regardless of the facility's actual billed charges. As a hypothetical, assume Facility A is an out-of-network facility and its usual and customary charge for widget surgery is three thousand dollars ($3,000.00) Assume Facility B is an in-network facility. If a patient has a hypothetical widget surgery at in-network Facility B, the "allowable charges" might be two thousand dollars ($2,000.00). But if the patient goes to out-of-network Facility A, and has the exact same widget surgery, Blue Cross arbitrarily reduces the "allowed charges" drastically, sometimes below one-quarter of the in-network fee (e.g. $500.00).  The patient is faced with either paying the difference between the arbitrarily lowered "allowed charge" of $500.00 and the actual usual and customary fee ($3,000.00).  In addition, the patient often has a much

larger co-pay and deductible. This has a tremendously strong effect to try and steer patients to facilities which have "in-network" status with Blue Cross, even though Blue Cross has led patients to believe it is selling a policy with out-of-network benefits.

### E. The Exclusionary Contracts Lack a Valid Procompetitive Business Justification.

78.    In this case, there is no valid procompetitive business justification for SIH's exclusionary contracts. SIH did not use the contracts to achieve any economies of scale or other efficiencies as a result of any additional patient volume that it obtained from the contracts.

### VII. VIOLATIONS ALLEGED

Restraint of Trade and Monopolization in Violation of Sherman Act § 1 & 2

79.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 78 above with the same force and effect as though said paragraphs were set forth here in full.

80.    SIH possesses monopoly power in the relevant product markets in the Williamson County and Jackson County areas, and surrounding geographic region.

81.    SIH has willfully maintained and abused its monopoly power in the relevant markets through its exclusionary contracts with commercial health insurers.

82.    Each exclusionary contract between SIH and a commercial health insurer constitutes an act by which SIH willfully exploits and maintains its monopoly power in the relevant product markets in the Williamson County and Jackson County areas, and surrounding geographic region.

83.    In this case, there is no valid procompetitive business justification for Defendant's use of the exclusionary contracts described above.

84.     The exclusionary contract entered into between SIH and Blue Cross violate

Section 1 & 2 of the Sherman Act, 15 U.S.C. § 1 & 2.

### COUNT I AGAINST DEFENDANT SIH
### TYING ARRANGEMENT WITH BLUE CROSS
### SHERMAN ACT, SECTION 1 & 2 (15 U.S.C. § 1 & 2)
### AND CLAYTON ACT, SECTION 3 (15 U.S.C. § 14)

85.     Marion HealthCare incorporates its allegations in paragraphs 1-78 against SIH as

if fully stated herein.

86.     This conduct constitutes a per se illegal tie by SIH of its outpatient ambulatory

surgery services to Blue Cross with its general inpatient hospital services to Blue Cross,

*i.e.* the tying product is SIH's general inpatient hospital services, and the tied product is

SIH's outpatient ambulatory surgical services.

87.     SIH used its monopoly power to induce Blue Cross to exclude Marion

HealthCare, L.L.C. surgery center as a provider of outpatient ambulatory surgery services

in Williamson and Jackson County, in order to obtain discounted rates from Blue Cross

for general inpatient hospital services.

88.     SIH's more than 85% market share of patients covered with commercial

insurance in the relevant geographic market give it significant market power and the

ability to economically induce Blue Cross to offer SIH exclusivity for outpatient

ambulatory surgical services, and SIH exercised its market power.

89.     This tie affected a significant volume of business in the tied market and has had

an anticompetitive effect in the market for outpatient ambulatory surgery services within

the geographic market area, Williamson and Jackson County and local surrounding areas.

Blue Cross recently contracted with the state of Illinois to become a dominant provider of health insurance for state employees in the region, including employees employed by Southern Illinois University, state employees, dependents and retired state workers. Because Blue Cross is a major supplier of commercial health insurance in the region, and is a major private seller of group and individuals healthcare insurance, exclusion from the Blue Cross network has the ability to affect a large segment of the healthcare market.

90.     SIH's exclusionary conduct has harmed Plaintiff Marion HealthCare, L.L.C. surgery center in several ways, including but not limited to:

   a. Plaintiff Marion HealthCare, has been unable to grow its outpatient surgery business.

   b. Plaintiff Marion HealthCare, has sustained financial damages as a result of Defendants' conduct.

   c. Plaintiff, Marion HealthCare, has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to procure an in-network contract with Blue Cross.

   d. The overall business value of Marion HealthCare has decreased because of this exclusionary anti-competitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

### COUNT II AGAINST DEFENDANT SIH
### TYING ARRANGEMENT WITH BLUE CROSS
### ILLINOIS ANTITRUST ACT (740 ILCS 10/3)

91. Plaintiff, Marion HealthCare, L.L.C., incorporates its allegations in paragraphs 1- 78 against SIH as if fully stated herein.

92.     This conduct constitutes a per se illegal tie by SIH of its outpatient ambulatory surgery services to Blue Cross with its general inpatient hospital services to Blue Cross, *i.e.* the tying product is SIH's general inpatient hospital services, and the tied product is SIH's outpatient ambulatory surgical services.

93.     SIH improperly induced Blue Cross to agree to exclude competing outpatient ambulatory surgery services in Williamson and Jackson County, in order to obtain discounted rates from SIH for general inpatient hospital services.

94.     SIH's more than 75% share of the market for acute care inpatient services in the relevant geographic market gave it significant market power and the ability to improperly economically induce Blue Cross to offer SIH exclusivity for outpatient ambulatory surgical services and to subsequently greatly reduce Plaintiff Marion HealthCare, L.L.C. surgery center's ability to serve patients covered with Blue Cross health insurance, and it so exercised its market power. In return for this improper exclusion of Plaintiff, Blue Cross benefitted by paying lower rates to SIH for its inpatient hospital services. This improper tying arrangement with its exclusive agreement allows SIH to monopolize the outpatient surgical market.

95.     This tie affected a significant volume of business in the tied market and had an anticompetitive effect in the market for outpatient ambulatory surgery services in Williamson and Jackson Counties, Illinois. Because Blue Cross is a major supplier of commercial health insurance in the region, including employees of the state and federal government, their dependents, and other retirees, the resulting net revenue from treating patients covered by Blue Cross health insurance accounts for a significant portion of outpatient surgery services in Williamson and Jackson Counties, Illinois.

96.     The exclusionary conduct between SIH and Blue Cross has harmed Plaintiff, Marion HealthCare L.L.C., in several ways, including but not limited to:

    a. Plaintiff, Marion HealthCare, has been unable to grow its outpatient surgery business.

    b. Plaintiff Marion HealthCare, L.L.C. has sustained financial damages as a result of Defendants' conduct.

    c. Plaintiff, Marion HealthCare, has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to procure an in-network contract with Blue Cross.

    d. The overall business value of Marion HealthCare has decreased because of this exclusionary anti-competitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

**COUNT III AGAINST DEFENDANT BLUE CROSS
TYING ARRANGEMENT BETWEEN BLUE CROSS AND SIH
SHERMAN ACT, SECTION 1 & 2 (15 U.S.C. § 1 & 2)
AND CLAYTON ACT, SECTION 3 (15 U.S.C. § 14)**

97.     Marion HealthCare incorporates its allegations in paragraphs 1-78 against Blue Cross as if fully stated herein.

98.     This conduct constitutes a per se illegal tie between Blue Cross and SIH.

99.     Blue Cross' exclusionary conduct has harmed Plaintiff, Marion HealthCare, in several ways, including but not limited to:

    a. Plaintiff, Marion HealthCare, has been unable to grow its outpatient surgery business.

b. Plaintiff, Marion HealthCare, has sustained financial damages as a result of Defendants' conduct.

c. Plaintiff, Marion HealthCare, has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to procure an in-network contract with Blue Cross.

d. The overall business value of Marion HealthCare, has decreased because of this exclusionary anti-competitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

### COUNT IV AGAINST DEFENDANT BLUE CROSS
### TYING ARRANGEMENT BLUE CROSS AND SIH
### ILLINOIS ANTITRUST ACT (740 ILCS 10/3)

100.    Marion HealthCare incorporates its allegations in paragraphs 1-78 against Blue Cross as if fully stated herein.

101.    This conduct constitutes a per se illegal tie between Blue Cross and SIH.

102.    Blue Cross' exclusionary conduct has harmed Plaintiff Marion HealthCare, L.L.C. surgery center in several ways, including but not limited to

a. Plaintiff, Marion HealthCare, has been unable to grow its outpatient surgery business.

b. Plaintiff, Marion HealthCare, has sustained financial damages as a result of Defendants' conduct.

c. Plaintiff, Marion HealthCare, has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to procure an in-network contract with Blue Cross.

d. The overall business value of Marion HealthCare has decreased because of this exclusionary anti-competitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

### COUNT V AGAINST DEFENDANT BLUE CROSS TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY

103.    Marion HealthCare, L.L.C. has a reasonable expectancy of a valid business relationship with physicians and patients in Williamson and Jackson Counties, Illinois, as many of these patients and physicians desire a high quality, cost efficient facility for undergoing or receiving health care services.

104.    Marion HealthCare, L.L.C has a reasonable business expectancy with the physicians on its medical staff, and under Illinois law the medical staff bylaws constitute a contract between the facility and the staff physicians.

105.    Blue Cross knew of Marion HealthCare, L.L.C.'s business relationship with certain physician using its surgery center and targeted those physicians by sending them certified letters, signed by William Patten, Blue Cross Senior Director, Professional Network Management, threatening to terminate their Blue Cross contract if they continued to utilize Marion HealthCare surgery center.

106.    In addition, Blue Cross intentionally notified patients who were planning or scheduled to have surgery at Marion HealthCare, L.L.C. and informed these patients the facility was out-of-network and threatened those patients they could be liable for a much larger health care bill if they utilized Marion HealthCare surgery center. These notifications included patients who had previously received services at Marion HealthCare L.L.C in the past.

107.    Blue Cross has refused to contract with Marion HealthCare, L.L.C. and refused to allow it to become an in-network provider due to an exclusive contract Blue Cross has with SIH.

108.    As a result of the improper Blue Cross threats and misstatements to physicians and patients, some physicians and patients cancelled their planned surgery at Marion HealthCare, L.L.C.

109.    Marion HealthCare, L.L.C. suffered damages as a result of Blue Cross' wrongful conduct, include a loss of revenue related to the cancellation of surgeries at the facility.

### COUNT VI AGAINST DEFENDANT BLUE CROSS
### PRICE DISCRIMINATION AGAINST MARION HEALTHCARE, L.L.C.
### SHERMAN ACT, SECTION 1 & 2 (15 U.S.C. § 1 & 2) AND
### CLAYTON ACT, SECTION 2 (15 U.S.C. § 13)

110.    Marion HealthCare incorporates its allegations in paragraphs 1-78 against Blue Cross as if fully stated herein.

111.    Blue Cross arbitrarily discriminates against Marion HealthCare, L.L.C as an out-of-network provider, by arbitrarily setting an "allowable" fee for outpatient surgical services far below the "allowable" fee for in-network providers including SIH, notwithstanding the fact the same outpatient surgical service is being performed, and only the location is different.

112.    The Blue Cross arbitrary price discrimination violates Sections 1 & 2 of the Sherman Act, 15 U.S.C. § 1 & 2, and Section 2 of the Clayton Act, 15 U.S.C. § 13;  the price discrimination results in furthering the monopoly power of SIH, and the price discrimination improperly induces patients to avoid utilizing Marion HealthCare, L.L.C.

113.    The price discrimination has damaged Marion HealthCare, L.L.C. by decreasing

its financial revenues and decreasing the volume of patients who utilize the facility.

## VIII. REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

a)      The Court adjudge and decree Defendants have acted unlawfully to restrain trade

and maintain a monopoly in violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §

1 & 2;

b)      Equitable Relief seeking the Court to permanently enjoin SIH and Blue Cross,

their officers, directors, agents, employees, and successors, and all other persons acting or

claiming to act on their behalf, directly or indirectly, from seeking, negotiating for,

agreeing to, continuing, maintaining, renewing, using, or enforcing, or attempting to

enforce exclusionary contracts between each other as pertains to this matter, and

furthermore prohibiting and enjoining Blue Cross from price discrimination in the

outpatient surgical market;

c)      Equitable Relief seeking the Court to reform existing contracts to remove the

exclusionary provisions, enjoin SIH and its subsidiaries from expanding its ownership of

physician medical practices, nurse practitioner practices and physician assistants in the

market, and order a restructuring of SIH's organizational structure and health care

provider agreements to eliminate its monopoly in the marketplace or other reasonable

alternatives;

d)      On Count I AGAINST SIH, TYING ARRANGEMENT WITH BLUE CROSS:

      i.      compensatory damages;

      ii.     treble damages;

          iii.     attorneys fees and costs; and

          iv.     such other and further relief as the Court deems appropriate

e)     On Count II AGAINST SIH, TYING ARRANGEMENT WITH BLUE CROSS:

          i.     compensatory damages;

          ii.     treble damages;

          iii.     attorneys fees and costs; and

          iv.     such other and further relief as the Court deems appropriate

f)     On Count III AGAINST  BLUE CROSS, TYING ARRANGEMENT WITH SIH:

          i.     compensatory damages;

          ii.     treble damages;

          iii.     attorneys fees and costs; and

          iv.     such other and further relief as the Court deems appropriate

g)     On Count IV AGAINST BLUE CROSS, TYING ARRANGEMENT WITH SIH:

          i.     compensatory damages;

          ii.     treble damages;

          iii.     attorneys fees and costs; and

          iv.     such other and further relief as the Court deems appropriate

h)     On Count V AGAINST BLUE CROSS, TORTIOUS INTERFERENCE WITH

BUSINESS EXPECTANCY:

          i.     compensatory damages

          ii.     attorneys fees and costs; and

          iii.     Equitable relief enjoining Blue Cross from fee discrimination

          iv.     such other and further relief as the Court deems appropriate

i)      On Count VI AGAINST BLUE CROSS, PRICE DISCRIMINATION:

      i.     compensatory damages

      ii.    treble damages and costs; and

      iii.   equitable relief enjoining Blue Cross from price discrimination against

              Marion HealthCare for outpatient surgical services

      iv.   such other relief as the Court deems appropriate

### JURY DEMAND

PLAINTIFF RESPECTFULLY DEMANDS TRIAL BY JURY ON ALL ISSUES

TRIABLE AS SUCH.

Respectfully submitted this 3rd day of August, 2012,

          s/THOMAS J. PLIURA
          Thomas J. Pliura,
          Attorney for Plaintiff/Lead Counsel
          Law Offices of Thomas J. Pliura, M.D., J.D.
          P.O. Box 130
          LeRoy, IL 61752
          Telephone:  (309)962-2299
          Fax:  (309)962-4646
          tom.pliura@zchart.com