IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS


**MARION HEALTHCARE LLC,**

     **Plaintiff,**

**v.**        **CIVIL NO. 12-CV-00871-DRH-PMF**

**SOUTHERN ILLINOIS
HEALTHCARE,
and HEALTH CARE SERVICE
CORPORATION, d/b/a BLUECROSS
AND BLUESHIELD OF ILLINOIS,**

     **Defendants**.


## MEMORANDUM & ORDER

**HERNDON, Chief Judge:**

Before the Court is defendant Health Care Service Corporation, d/b/a BlueCross and BlueShield of Illinois' ("BCBSI") motion to dismiss the first amended complaint (Doc. 22) and memorandum in support (Doc. 23). Also before the Court is defendant Southern Illinois Healthcare's ("SIH") motion to dismiss the first amended complaint (Doc. 25) and memorandum in support (Doc. 25-1).  Plaintiff filed a single response in opposition to defendants' motions to dismiss (Doc. 29) and defendant BCBSI filed a reply (Doc. 31).

## BACKGROUND

Plaintiff Marion HealthCare, LLC ("MHC"), filed a seventy-two (72) page, eleven (11) count amended complaint against SIH and BCBSI alleging violations of federal and state antitrust law, specifically, Sections 1 and 2 of the Sherman Act

(15 U.S.C. §§ 1, 2), Sections 2 and 3 of the Clayton Act (15 U.S.C. §§ 13, 14), and

the Illinois Antitrust Act (740 ILCS 10), and a state law claim of tortious

interference with a business expectancy.

In sum, plaintiff alleges that defendants SIH and BCBSI, through

exclusionary agreements and other conduct, including exclusive dealing, price

discrimination, and monopolization, have substantially suppressed competition

for outpatient surgical services in a defined relevant market in Southern Illinois.

Plaintiff claims that defendants are foreclosing competition, harming healthcare

consumers through higher prices, diminishing the choice of outpatient service

providers, reducing innovation, and increasing barriers to entry for competing

service providers.  Plaintiff seeks damages and for this Court to enjoin defendants

from entering into, maintaining, or enforcing contracts that prevent BCBSI from

contracting with SIH's competitors, including plaintiff.

Plaintiff raises the following five (5) claims against defendant SIH: (Count I)

exclusive dealing with BCBSI in violation of Section 1 of the Sherman Act (15

U.S.C. § 1) and Clayton Act (15 U.S.C. § 14); (Count III) exclusive dealing with

BCBSI in violation of the Illinois Antitrust Act; (Count V) tying arrangement with

BCBSI in violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Clayton

Act (15 U.S.C. § 14); (Count VI) tying arrangement with BCBSI in violation of the

Illinois Antitrust Act (740 ILCS 10/3); (Count IX) monopolization in violation of

Section 2 of the Sherman Act (15 U.S.C. § 2).

Plaintiff raises the following six (6) claims against defendant BCBSI: (Count

II) exclusive dealing with SIH in violation of Section 1 of the Sherman Act (15

U.S.C. § 1) and Clayton Act (15 U.S.C. § 14); (Count IV) exclusive dealing with SIH

in violation of the Illinois Antitrust Act; (Count VII) tying arrangement with SIH in

violation of Section 1 of the Sherman Act (15 U.S.C. § 1) and Clayton Act (15

U.S.C. § 14); (Count VIII) tying arrangement with SIH in violation of the Illinois

Antitrust Act (740 ILCS 10/3); (Count X) price discrimination against MHC in

violation of Section 2 of the Clayton Act (15 U.S.C. § 13); and (Count XI) tortious

interference with a business expectancy.

### A. The Parties and Other Southern Illinois Healthcare Providers

The Court accepts as true, as it must, for the purpose of considering the

motions to dismiss, the following facts alleged in plaintiff's amended complaint.

Plaintiff, MHC is a multi-specialty freestanding outpatient surgery center which

offers outpatient surgical services.  Plaintiff does not offer inpatient services. MHC

opened for business in 2004, and is located in the relevant geographic area,

defined by plaintiff as Williamson County and Jackson County, Illinois, and the

surrounding areas in close proximity to or bordering these two counties.

Defendant SIH is a nonprofit corporation that owns various acute-care

hospitals which provide inpatient and outpatient medical services.  In addition,

SIH owns (wholly or partially) freestanding outpatient surgical service providers.

Specifically, Plaintiff claims there are four hospitals within the defined geographic

area that provide outpatient surgical services, namely, Heartland Regional Medical

Center, owned by Community Health Systems, and the remaining three owned by

SIH: Memorial Hospital of Carbondale, Herrin Hospital, and St. Joseph Memorial Hospital. There are also five freestanding providers of outpatient surgical services within the relevant geographic market, including plaintiff, two providers fully or partially owned by SIH which compete with plaintiff, Physicians' Surgery Center, L.L.C. ("PSC"), and Southern Illinois Orthopedic Center, LLC ("SIOC"), and two others, Marion Surgery Center, and Pain Care Surgery Center, which provide a narrow scope of specialized services and do not compete with plaintiff.

**B. Allegations Regarding Relevant Market**

Plaintiff defines two relevant markets: (1) "the sale of general acute-care inpatient hospital services, including pediatric services and neonatal care services to commercial health insurers," and (2) "the sale of outpatient surgical services to commercial health insurers." (Doc. 13 at 2). Commercial health insurers include managed-care organizations, rental networks, and self-funded plans. Plaintiff excludes government payers, such as Medicare, Medicaid, and TRICARE from the relevant markets.

In the relevant geographic market, SIH has approximately a 77% share of the market for inpatient hospital services sold to commercial insurers, and a more than an 85.3% share of the market for outpatient services sold to commercial insurers. Accordingly, plaintiff asserts, most health insurance companies in the relevant geographic market consider SIH a "must-have" hospital system for health plans because it is the largest hospital system in the region and the only local provider of certain essential services.

Plaintiff alleges that hospitals or other facilities outside of the relevant geographic area do not compete with those within the area for the sale of the relevant products in a manner that would create a competitive market or otherwise constrain the pricing or other behavior of the providers within the geographic area.  Further, competition for the sale of inpatient and outpatient services to commercial health insurers from outside the geographic area would not be sufficient to prevent a hypothetical monopolist provider of either of these services within the geographic area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

Defendant BCBSI allegedly is the largest health insurance company in Illinois, and the dominant health insurer in Williamson and Jackson Counties, Illinois, and the surrounding area.  Accordingly, BCBSI is the dominant provider of health insurance covering inpatient and outpatient services, and has market power for health insurance coverage in the defined geographic market.  Plaintiff claims that on at least three (3) occasions, it submitted an application to BCBSI for acceptance as a network provider with BCBSI, but was denied each time. Plaintiff believes that SIH, by virtue of its contracts with BCBSI, prohibits BCBSI from contracting with plaintiff and other competitors for health-care services as an "in-network" provider, which could thereby make plaintiff competitive within the relevant area.  In 2011, a BCBSI representative informed plaintiff that BCBSI had an exclusive contract with SIH which precluded or prohibited BCBSI from contracting with plaintiff.  It is this exclusive agreement between SIH and BCBSI

that forms the crux of plaintiff's claims.

### C. Basis of Plaintiff's Claims

Plaintiff alleges that SIH has monopoly power in the two relevant markets in the defined geographical area, and that its prices have climbed.  Further, plaintiff alleges that SIH is attempting to increase its control over the referral of patients in the market by acquiring or otherwise controlling independent providers in the area, in an attempt to further establish its monopoly power. Plaintiff alleges that SIH is the largest provider of inpatient and outpatient services in Williamson and Jackson Counties and the surrounding areas.

Plaintiff claims that SIH willfully maintained and extended its monopoly power through the use of anticompetitive exclusionary contracts.  Specifically, plaintiff alleges that BCBSI had a compelling business need to include SIH in its network of inpatient service providers.  Further, in consideration of discounts sought by BCBSI on inpatient services, SIH demanded exclusionary language in its contracts with commercial insurance companies, including BCBSI, prohibiting BCBSI from contracting with competing providers, including plaintiff, MHC. Plaintiff alleges that SIH improperly and illegally coerced BCBSI into entering into an agreement that tied discounts for coverage of SIH's inpatient hospital services with exclusive contracting for in-network coverage of SIH's outpatient surgical services, prohibiting BCBSI from contracting for in-network coverage with competing freestanding outpatient surgery centers in the region.  Plaintiff alleges that this arrangement constitutes exclusive dealing and tying.

Plaintiff further alleges that inclusion in health insurance networks is critical as patients generally seek services from "in-network" providers because, typically, an insurer charges a member substantially lower co-payments or other

charges when the member uses an in-network provider.  In this manner, the patient's out of pocket costs are generally lower if they use an in-network provider.  Plaintiff alleges that because of SIH's monopoly power and BCBSI's market power, the exclusionary agreements between these parties have substantially foreclosed plaintiff and other competitors from commercial health-insurance contracts for outpatient services in the relevant geographic area. Without these contracts, plaintiff alleges, SIH's competitors cannot effectively compete.  Additionally, by refusing to grant competitors in-network status, SIH and BCBSI have substantially reduced the number of patients who would otherwise use plaintiff or other competitors for outpatient services, and effectively denied access to non-SIH providers to a substantial percentage of patients who hold BCBSI insurance coverage.

Further, plaintiff claims that most patients must pay SIH substantially more for its outpatient surgical services, as compared to having the procedure performed in a non-SIH owned or partially owned facility.  Therefore, plaintiff alleges, SIH's contracts prevent members of the public from accessing competing full service outpatient surgical services in a cost-efficient manner.

Plaintiff alleges that patients covered by government plans like Medicare or Medicaid are not adequate substitutes for commercially insured patients, because government plans pay providers significantly less than commercial health insurers.  Through its exclusionary contracts with BCBSI, SIH retains substantial profits that would otherwise be available to plaintiff.  Plaintiff asserts that this additional earned profit, if available to plaintiff, would provide the basis for increased competition, increased services, greater innovation and greater choices for patients.

7

Additionally, plaintiff alleges that SIH's exclusionary contracts violate antitrust laws, have reduced competition, and caused substantial anticompetitive effects, such as: delaying and preventing the expansion and entry of SIH's competitors, likely leading to higher healthcare costs and higher insurance premiums; limited price competition for price-sensitive patients, likely leading to higher healthcare costs for those patients; reduced quality competition between SIH and its competitors; reduced the likelihood that patients will be treated at MHC; and reduced the healthcare options for patients in need of outpatient surgery, all without a valid business justification.

### D. Motions to Dismiss

Both defendants have filed motions to dismiss.  BCBSI asserts that (1) plaintiff's claims under § 3 of the Clayton Act, namely Counts II (Exclusive Dealing), VII (Tying), and X (Price Discrimination), should be dismissed because sections 2 and 3 of the Clayton Act apply to goods, not services; (2) plaintiff's claims under Count II (Exclusive Dealing) should also be dismissed because (a) the "market" identified by plaintiff is deficient as a matter of law, and (b) plaintiff cannot adequately plead substantial foreclosure; (3) plaintiff's Count VII claims under the Sherman Act should also be dismissed because plaintiff has not and cannot allege that BCBSI has market power in the tying product (inpatient hospital services) or the tied product (outpatient surgical services); (4) plaintiff's state law antitrust claims, Counts IV and VIII, should be dismissed on the same bases as their federal counterparts; and (5) plaintiff's tortious interference claim, Count XI, should be dismissed because the physicians and patients at issue were alleged to be under contract with BCBSI, and BCBSI cannot interfere with its own relationships as a matter of law, or, alternatively, Count XI should be dismissed

8

for lack of independent jurisdiction, should the Court determine that there are no viable federal claims.  BCBSI seeks dismissal of all claims against it, with prejudice.

SIH, in its motion to dismiss, asserts that: (1) plaintiff fails to allege facts supporting the proposition that SIH coerced BCBSI to contract with SIH for outpatient surgery services as a condition of a contract for inpatient hospital services, which is required to state a claim for unlawful tying under Section 1 of the Sherman Act and the Illinois Antitrust Act (Counts V, VI); (2) plaintiff fails to allege that the exclusive contract foreclosed plaintiff from the alleged market for the sale of outpatient surgery services to commercial insurers as it must to state a claim for exclusive dealing under Section 1 of the Sherman Act and the Illinois Antitrust Act (Counts I, III); (3) plaintiff fails to allege that SIH acquired or maintained its allegedly dominant position in the alleged relevant markets through anticompetitive conduct, which is necessary to state a claim for monopolization under Section 2 of the Sherman Act (Count IX); plaintiff's exclusive dealing and tying claims under Section 3 of the Clayton Act must be dismissed with prejudice because Section 3 of the Clayton Act only applies to goods and commodities, and not to services, which are at issue in this case (Counts I, III, V, and VI).

## **LEGAL STANDARD**

A motion pursuant to Fed. R. Civ. P. 12(b)(6) allows for dismissal for "failure to state a claim upon which relief can be granted."  To state a claim, a pleading need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  Furthermore, the Court

must review a complaint in the light most favorable to the plaintiff, accept as true all well-pleaded facts alleged, and draw all possible inferences in the plaintiff's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Detailed factual allegations are not required, but the pleading must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A plaintiff "can plead himself out of court by pleading facts that show that he has no legal claim." *Atkins v. City of Chicago*, 631 F.3d 823, 832 (7th Cir. 2011). Finally, the court must not apply a heightened pleading standard in antitrust cases. *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).

## ANALYSIS

I. **Clayton Act Claims - Exclusive Dealing, Tying, Price Discrimination (Counts I, II, V, VII, X)**

Both defendants SIH and BCBSI seek dismissal of plaintiff's claims to the extent that they arise under the Clayton Act[1] based upon their assertion that

---

[1] Section 3 of the Clayton Act provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such

Sections 2 and 3 of the Clayton Act (15 U.S.C. §§ 13, 14) apply only to goods and not to services.  In response, plaintiff asserts that it has alleged with specificity that defendants have engaged in exclusive dealing and tying with respect to goods, and that BCBSI has discriminated against plaintiff with respect to reimbursement of certain goods.  Additionally, plaintiff asserts that it has specifically described the essential role of certain goods that are required to perform medical services, for example, intravenous medications for anesthesia and preoperative and post-operative pain management, fixation devices for orthopedic surgery, and ablation kits for gynecological surgery, and that these goods are billed separately from the fees for services.  Plaintiff insists that the goods are integral to the performance of the service and that the surgical services could not be performed without the goods.

"There is ample authority that § 14 does not encompass the sale of services."  *Satellite T Associate v. Continental Cablevision of Virginia, Inc.*, 586 F.Supp. 973, 974 (E.D. Va. 1982), *aff'd*, 714 F.2d 351(4th Cir. 1983) (citing *Hudson Valley Asbestos Corp. v. Tougher Heating & Plumbing Co.*, 510 F.2d 1140, 1145 (2d Cir. 1975); *Advance Business Systems & Supply Co. v. SCM Corp.*, 415 F.2d 55, 64 (4th Cir. 1969); *Columbia Broadcasting System, Inc. v. Amana Refrigeration Inc.*, 295 F.2d 375, 378 (7th Cir. 1961).

---

lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

15 U.S.C. § 14.

In *Baum v. Investors Diversified Services, Inc.*, 409 F.2d 872, 874 (7th Cir. 1969), the Seventh Circuit upheld a district court's dismissal of a complaint "on the ground, inter alia, that a mutual fund share is not a 'commodity' within the meaning of Sec. 2(a) of the Clayton Act, as amended by the Robinson-Patman Act." The Court explained:

> We think, moreover, that the word "commodity" has the same meaning in both Sec. 2(a) and Sec. 3 of the Act. Section 3 of the Clayton Act, 15 U.S.C. § 14, renders illegal certain tying clauses in leases or sales of "goods, wares, merchandise, machinery, supplies, or other commodities . . . ." Under the principle of ejusdem generis the word "commodities" is restricted to the same class of articles previously enumerated, all of which are tangible products.
>
> This court has indicated that the word "commodity" as used in the Clayton Act is restricted to products, merchandise or other tangible goods.

409 F.2d at 875. After the district court determined that a mutual fund share was not a "commodity," the plaintiff's complaint was dismissed for failure to state a claim upon which relief can be granted, and the Seventh Circuit affirmed. *Id*. at 872, 876

Similarly, in *Tri-State Broadcasting Co. v. United Press Intern., Inc.*, 369 F.2d 268, 269 (5th Cir. 1966), a district court's dismissal of an action on the basis that a service supplied by the defendant did not constitute a "commodity" under the Act, was affirmed by the Fifth Circuit. The *Tri-State* court noted that "the mere form of a contract will not be given controlling effect if the substance of the contemplated transaction brings it within the antitrust laws," but that it was apparent that the transaction at issue contemplated the sale of a non-commodity.

*Id.* at 269-70.  The Court opined that "[v]irtually no transfer of an intangible in the nature of a service, right, or privilege can be accomplished without the incidental involvement of tangibles, and we conclude that in such circumstances the dominant nature of the transaction must control in determining whether it falls within the provisions of the Act."  *Id.* at 270.

The Seventh Circuit has also adopted the "dominant nature" analysis. "[T]he transfer of an intangible or service can rarely be accomplished without the incidental involvement of . . . tangibles.  To distinguish between goods and services the dominant nature of the transaction governs whether the activity is subject to the Act."  *First Comics, Inc. v. World Color Press, Inc.*, 884 F.2d 1033, 1035 (7th Cir. 1989).  Notably, the district court in the *Satellite T* case dismissed the Clayton Act claims at the pleadings stage, after determining via the "dominant nature of the transaction analysis" that the contracts at issue were for an intangible service, and not the tangible equipment required to receive the service, and this particular determination was upheld by the Fourth Circuit Court of Appeals in *Satellite Television & Associated Resources, Inc. v. Continental Cablevision of Virgina, Inc.*, 714 F.2d 351, 358 (4th Cir. 1983), *cert denied*, 465 U.S. 1027 (1984).

Courts have also recognized that tying claims involving services are outside the scope of the Section 3 of the Clayton Act, *see Chawla v. Shell Oil Co.*, 75 F.Supp.2d 626, 644 (S.D. Tex. 1999), and that in general, Section 3 does not apply to services.  *See Chelson v. Oregonian Pub. Co.*, 715 F.2d 1368, 1372 (9th

Cir. 1983).   In *Columbia Broadcasting System, Inc. v. Amana Refrigeration, Inc.*, 295 F.2d 375, 378 (7th Cir. 1961), the Seventh Circuit affirmed dismissal of a counterclaim based in part on the claim's insufficiency given that "15 U.S.C. § 14 does not apply to tie-ins involving services."

In the case at bar, the plaintiff itself designates the relevant markets as the sale of inpatient and outpatient *services*, and has included goods on the basis that some goods are utilized and billed for separately.  The Seventh Circuit has stated, however, that "[m]edical services are not 'commodities.'"  *Ball Memorial Hosp., Inc. v. Mutual Hosp. Ins., Inc.*, 784 F.2d 1325, 1340 (7th Cir. 1986).

Plaintiff argues that a determination as to whether the goods alleged are "incidental" is premature at the pleadings stage because it is a question of fact unripe for a motion to dismiss.  The Seventh Circuit has stated otherwise, however: "[p]laintiff contend [sic] that the issue of whether a transaction's 'dominant nature' is tangible or intangible presents a question of fact which cannot be determined on a motion to dismiss.  We disagree."  *Freeman v. Chicago Title & Trust Co.*, 505 F.2d 527, 531 n.10 (7th Cir. 1974).  The *Freeman* Court noted that previous cases from both the Seventh and Fifth circuits dismissed Clayton Act claims on motions to dismiss.  *Id.*   "In some cases, the dominant nature of a transaction may be apparent from the pleadings, and thus the case may be disposed of on a motion to dismiss.  However, in cases where the nature of the transaction is not apparent from the pleadings, it is inappropriate to dispose of the case without analyzing a developed record."

*Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 344 F.Supp.2d 936,

942-43 (M.D. Pa. 2004) (citation omitted).

It is clear, in this case, that the goods involved are mere incidentals to the

contract for services, and therefore, fall outside the scope of the Clayton Act.

Plaintiff has defined the relevant markets as "inpatient hospital services" and

"outpatient surgical services."  Upon amendment of this portion of its original

complaint, plaintiff added allegations that "prescription medications delivered

intravenously," "various fixation devices," and "other products" that patients may

receive during outpatient surgery constitute "goods or commodities," are billed

separately from services, and are essential to many of the services provided.

Plaintiff's attempt to add tangential goods to his claims in order to bring them

within the purview of the Clayton Act does not muddle the obvious nature of the

contract for services at issue.  Neither BCBSI nor SIH is in the business of selling

drugs, implants, and fixation devices, although some of those materials may be

used incidentally to services provided by SIH.  The dominant nature of the

transaction at issue is surely services, and plaintiff's characterization of the goods

involved is insufficient to invoke the Clayton Act.

The Court is satisfied that the nature of the transaction is apparent from

the pleadings, and that plaintiff has failed to allege that the agreement was one for

goods or commodities as required for the claims to fall under the purview of the

Clayton Act, and these claims cannot survive.  Any further amendment of these

claims would be contradictory and/or futile and will not be allowed.  To the extent

that Counts I, II, III, IV, V, VI, VII, VIII, and X, of plaintiff's amended complaint attempt to bring claims pursuant to Sections 2 or 3 of the Clayton Act, those claims are **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted because plaintiff cannot bring these claims under the Clayton Act.

## II.    SHERMAN ACT CLAIMS – EXCLUSIVE DEALING, TYING, MONOPLIZATION (I, II, V, VII, IX)

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  "The purpose of the Sherman Act is to protect consumers from injury that results from diminished competition."  *Agnew v. National Collegiate Athletic Ass'n*, 683 F.3d 328, 334-35 (7th Cir. 2012).  To state a claim pursuant to 15 U.S.C. § 1, the plaintiff must allege: "(1) a contract, combination, or conspiracy; (2) a resultant unreasonable restraint of trade in the relevant market; and (3) an accompanying injury."  *Denny's Marina Inc. v. Renfro Productions, Inc.*, 8 F.3d 1217, 1220 (7th Cir. 1993).  The plaintiff must allege an injury to himself in addition to an injury to the market.  *Agnew*, 683 F.3d at 335.

The Seventh Circuit recently outlined in *Agnew*, the three frameworks under which courts analyze whether actions have anticompetitive effects, noting that the frameworks "often blend together."  *Id*.  Further, "the determination of whether a restraint is unreasonable must focus on 'the competitive effects of challenged behavior relative to such alternatives as its abandonment or a less

restrictive substitute.'" *Id*. (quoting Philip Areeda, *Antitrust Law* ¶ 1500, at 362-63 (1986)).  In other words, each of the three methods is meant to enable the court to determine: "'whether or not the challenged restraint enhances competition.'" *Id*. (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 780 (1999); *NCAA v. Bd. Of Regents*, 468 U.S. 85, 104 (1984)).  A brief description of the three frameworks follows.

Under Rule of Reason analysis (the standard framework):

the plaintiff carries the burden of showing that an agreement or contract has an anticompetitive effect on a given market within a given geographic area.  As a threshold matter, a plaintiff must show that the defendant has market power—that is, the ability to raise prices significantly without going out of business—without which the defendant could not cause anticompetitive effects on market pricing.  If the plaintiff meets his burden, the defendant can show that the restraint in question actually has a procompetitive effect on balance, while the plaintiff can dispute this claim or show that the restraint in question is not reasonably necessary to achieve the procompetitive objective.

*Id*. at 335-36 (internal citations omitted).

The second framework is the "per se rule."  Courts use the "per se rule" when "a 'practice facially appears to be one that would always or almost always tend to restrict competition and decrease output.'"  *Id.* at 336 (quoting *Bd. of Regents*, 468 U.S. at 100).  Under this method, certain restraints, such as horizontal price fixing and output limitation, are found to be unreasonable as a matter of law without an inquiry into the market in which the restraint operates. *Id*.

The third framework is the "quick-look" analysis.  Courts use the "quick-look" analysis "where the per se framework is inappropriate, but where 'no elaborate industry analysis is required to demonstrate the anticompetitive character of . . . an agreement,' and proof of market power is not required."  *Id.* (quoting *Bd. of Regents*, 468 U.S. at 109).  "Under this approach, if no legitimate justifications for facially anticompetitive behavior (such as price-fixing) are found, no market power analysis is necessary and the court 'condemns the practice without ado.'"  *Id.* (quoting *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 961 F.2d 667, 674 (7th Cir. 1992).  "[I]f justifications are found, a full Rule of Reason analysis may need to take place."  *Id.*

### A. Exclusive Dealing

Defendant BCBSI asserts that Count II (exclusive dealing), must be dismissed because plaintiff has failed to plead, and cannot adequately plead, a relevant market[2] or substantial foreclosure.  BCBSI assets that vertical exclusive dealing arrangements, like the one alleged here in which BCBSI secured lower prices on inpatient hospital and outpatient surgical services subject to the condition that BCBSI would purchase outpatient services only from SIH, are not presumed illegal.  BCBSI asserts that the agreement is not subject to "per se"

---

[2] "The relevant market has both a product and a geographic dimension."  *Republic Tobacco Co. v. North Atlantic Trading Co. Inc.*, 381 F.3d 717, 738 (7th Cir. 2004).  "Identifying a geographic market requires both, 'careful selection of the market area in which the seller operates, and to which the purchaser can practicably turn for supplies.'"  *Id.* (quoting *Tampa Electric Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).  At this point in the proceedings, the relevant geographic market is not in dispute.

analysis, but instead, falls under the "rule of reason" framework.   The Court agrees that this vertical arrangement is not subject to the "per se" analysis.

Under the "rule of reason" framework, BCBSI asserts that the relevant markets alleged by the plaintiff are deficient as a matter of law, and that the foreclosure allegations are fatally flawed.  BCBSI asserts that the markets defined by plaintiff are deficient because they are limited to inpatient hospital and outpatient surgical services paid for by commercial insurers and, therefore, exclude government payers (Medicare and Medicaid) to whom plaintiff can and does sell its services.

Plaintiff opposes dismissal of its claim on this basis, arguing that private insurance payments and payments from government insurers are not interchangeable, in that Medicare and Medicaid pay providers significantly lower prices than do private insurers.  In this way, plaintiff argues, the two payers are not interchangeable, in that Medicare/Medicaid patients provide only a fraction the reimbursement provided by private insurers.

In support of its position, BCBSI cites *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591 (8th Cir. 2009), in which the court considered the question of whether the relevant market could be limited to patients covered by private insurance in an antitrust case (in which plaintiffs alleged exclusive dealing and monopolization) brought by a cardiology clinic and its physicians against a hospital and insurance providers.  The court decided that the relevant market could not be so limited and upheld the dismissal of plaintiff's antitrust claims

(with prejudice) on this basis.  *Id.* at 597-98.  The *Little Rock* court stated that the plaintiff's market, limited by the consumer's method of payment, lacked "support in both logic and law."  *Id*. at 597.  The court noted that the relevant inquiry in that particular case, "an exclusive dealing case involving shut-out cardiologists . . . is whether there are alternative patients available to the cardiologists." *Id.*

The plaintiff in *Little Rock*, like the plaintiff here, argued that private insurance and government insurance, as methods of payment, are not reasonably interchangeable.  *Id.*  The court reasoned that in light of plaintiff's allegation that defendant's unlawful actions resulted in plaintiff's access to fewer patients, the relevant question was, to whom might the cardiologists/plaintiffs provide services? *Id*.  In that case, as in this one, the plaintiff/provider could provide services to patients who utilize Medicare or Medicaid, as well as those who pay for services via a private insurer.  *Id.*

"Patients able to pay their medical bill, regardless of the method of payment, are reasonably interchangeable from the cardiologist's perspective—the correct perspective from which to analyze the issue in this case."  *Id.*  The court focused on the inquiry, "to whom can the supplier sell?" and noted that the plaintiff made no allegation that patients covered by private insurance were the only patients to whom it could sell.  *Id.*  The Court held that "as a matter of law, in an antitrust claim brought by a seller, a product market cannot be limited to a single method of payment when there are other methods of payment that are acceptable to the seller."  *Id*. at 598.  Other courts have similarly held, "[w]hen

there are numerous sources of interchangeable demand, the plaintiff cannot circumscribe the market to a few buyers in an effort to manipulate the buyers' market share." *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1119 (10th Cir. 2008); *see also, Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 67 (1st Cir. 2004).

Plaintiff cites *United States v. Dentsply Int'l, Inc.*, 399 F.3d 181, 189-90 (3d Cir. 2005), for the proposition that exclusive dealing turns on denial or disadvantaged access to *significant* sources of input.[3]  Although plaintiff has alleged that government payers pay less than commercial insurers, and that the government reimbursement amounts are not negotiable, plaintiff has not adequately alleged that, Medicare or Medicaid patients are not significant sources of input to it as a supplier of outpatient services.

The Court finds the *Little Rock* case to be persuasive, and upon consideration of the facts of this case, **FINDS** that the relevant markets as defined by plaintiff are not plausible as stated.  Plaintiff failed to include in the relevant markets all potential buyers of inpatient or outpatient services.   Plaintiff's exclusive dealing claims (Counts I and II) are **DISMISSED WITHOUT PREJUDICE**.  Plaintiff will be granted leave to replead his claims, curing the noted deficiencies as part of an amended complaint.

---

[3] Plaintiff also heavily relies on a consent judgment which resulted from claims similar to plaintiff's in *United States and State of Texas v. United Regional Health Care System*, 7:11-cv-00030 (N.D. Tex. 2011), (Complaint, Final Judgment, and Competitive Impact Statement *available at* http://www.justice.gov/atr/cases).  The matters in this cited proceeding, however, were not adjudicated by a court on the merits on any issue of fact or law, and are not authoritative or controlling.  *See Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 312 (7th Cir. 1976) ("The entering of a consent decree, . . . . , is not a decision on the merits and therefore does not adjudicate the legality of any action by a party thereto.").

This determination affects not only plaintiff's claims of exclusive dealing, but each of plaintiff's antitrust claims brought pursuant the Sherman Act and the Illinois Antitrust Act.  Absent allegations of a "per se" violation, plaintiff must allege a relevant market in order to state a plausible antitrust claim.  *Little Rock*, 591 F.3d at 596.  "Without a well-defined relevant market, a court cannot determine the effect that an allegedly illegal act has on competition."  *Id.*

For instance, BCBSI also asserts that plaintiff's allegations of foreclosure are fatally flawed.  BCBSI asserts that even accepting all of plaintiff's allegations of foreclosure as true, plaintiff has merely asserted that it has been foreclosed from effectively competing for a "subgroup" of possible patients, namely, patients using commercial insurance who have selected BCBSI as their provider.  BCBSI asserts that plaintiff has not raised a claim that it has been foreclosed from competing for patients enrolled in commercial plans other than BCBSI's plans, nor has plaintiff plead that it has been completely foreclosed from serving BCBSI members, only that BCBSI members that utilize the plaintiff's services must pay higher out of pocket costs than those who use SIH.

In light of the Court's ruling on the "relevant market" aspect of plaintiff's exclusive dealing claim, the Court need not consider, at this juncture, whether plaintiff has adequately plead that it is "substantially foreclosed" from a defined market, in that the Court found the definition to be flawed.

**B.  Tying**

Plaintiff's claims regarding illegal tying also require an adequate relevant market definition. "Tying arrangements involve an agreement to sell one product (the tying product) only on the condition that the purchaser buy a second product (the tied product)." *A.O. Smith Corp. v. Lewis, Overbeck & Furman*, 979 F.2d 546, 547 (7th Cir. 1992). "The principal evils of tying arrangements are the foreclosure of competitors in the tied product market and the denial to buyers of the advantages of marketplace shopping." *Photovest Corp. v. Fotomat Corp.*, 606 F.2d 704, 724 (7th Cir. 1979).

Under the Sherman Act, a properly plead unlawful tying claim consists of the following four elements: (1) a tie exists between two separate products or services; (2) the tying seller has sufficient economic power in the tying product market to restrain free competition in the tied product market; (3) the tie affects more than an insubstantial amount of interstate commerce in the tied product; and (4) the tying seller has some economic interest in the sales of the tied product. *Reifert v. South Cent. Wisconsin MLS Corp.*, 450 F.3d 312, 317 (7th Cir. 2006) (citing *Carl Sandburg Vill. Condo. Ass'n No. 1 v. First Condo. Dev. Co.*, 758 F.2d 203, 207 (7th Cir. 1985)).

"The joint sale of two products is a 'tie' only if the seller exploits its control of the tying product 'to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms.'" *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 669 (7th Cir. 1985) (quoting *Jefferson Parish Hosp. District No. 2 v. Hyde*, 466 U.S.

2, 12 (1984)).  A plaintiff must show "that the buyer did *not* want to take both products from the same vendor."  *Id.*  "Only if buyers are forced to purchase the tied services as a result of the seller's market power would the arrangement have anticompetitive consequences."  *Id.* (citation omitted).  If a buyer wants both products together, the element of forcing is not met, and there is no tie-in.  *Id.*

### 1.  Tying Claim Against Defendant SIH

Defendant SIH seeks dismissal of the tying claims against it, Counts V and VI, on the basis that plaintiff failed to allege "forcing," the second element of a tying claim.  In light of the Court's ruling on the "relevant market" aspect of plaintiff's claims, the Court need not consider, at this time, whether plaintiff has adequately plead that SIH through its exclusive contracts, coerced BCBSI to purchase outpatient services from it, because SIH's market power in the relevant market cannot be analyzed until the relevant market is defined.[4]  Accordingly, plaintiff's tying claims against SIH, Counts V and VI[5] are **DISMISSED WITHOUT PREJUDICE** in order to allow amendment of the claims so that they may comply with the Court's relevant market ruling.

### 2.  Tying Claim Against Defendant BCBSI

---

[4] SIH asserts that plaintiff has not adequately plead coercion, and has merely established that SIH and BCBSI negotiated a contract provision that provided BCBSI members with larger discounts for SIH's inpatient and outpatient services in exchange for a limitation on BCBSI's ability to enter into contracts with non-SIH providers of outpatient services in a limited area. Plaintiff responds that it has sufficiently alleged coercion through its allegations that SIH has a more than 75% share of the market for acute care services and the ability to coerce BCBSI economically to agree not to provide in-network insurance coverage of outpatient surgical services provided by plaintiff and other competitors.

[5] As noted *infra*, plaintiff's Illinois Antitrust Act claims are subject to the same analysis as its federal claims, and its state law tying claim, Count VII, is dismissed on the same basis as the substantially similar federal claim.

A different analysis is in order with respect to plaintiff's tying claims against BCBSI, however, even in light of the Court's determination regarding the relevant market.  In Count VII, plaintiff asserts that SIH coerced BCBSI into entering into an agreement that tied discounts for coverage of SIH's inpatient hospital services with exclusive contracting for in-network coverage of SIH's outpatient surgical services, prohibiting BCBSI from contracting for in-network coverage with competing freestanding outpatient surgery centers in the region, constituting a per se illegal tie by SIH, or alternatively, an unlawful tie pursuant to the rule of reason.

BCBSI asserts that a threshold requirement for a tying claim under Section 1 of the Sherman Act is that the defendant must have market power in the tying product, citing *Ill. Tool Works Inc. v. Indep Ink, Inc.*, 547 U.S. 28, 46 (2006).  In *Illinois Tool Works*, the Supreme Court held that, "in *all* cases involving a tying arrangement, the plaintiff must prove that the defendant has market power in the tying product."  *Id*. (emphasis added).  According to BCBSI, plaintiff does not and cannot allege that BCBSI even offers the tying (inpatient hospital) or tied (outpatient surgical) services, and cannot, therefore allege that BCBSI has market power in either of those markets.  BCBSI argues that plaintiff merely alleges that BCBSI had a dominant market share in the health insurance market, but alleging market power in markets other than the one for the tying product are insufficient to state a claim.

25

At the outset, the Court agrees with BCBSI that allegations of defendant's market power in the tying and/or tied product markets is a required showing under either the per se standard, or the rule of reason analysis. *See Digital Equip. Corp. v. Uniq Digital Technologies, Inc.*, No. 88 C 0644, 1993 WL 338985, at *4 (N.D. Ill. Sept. 1, 1993), *modified on reconsideration*, No. 88-0644, 1995 WL 12297 (N.D. Ill. Jan 11, 1995), *aff'd*, 73 F.3d 756 (7th Cir. 1996). Furthermore, plaintiff has not alleged and cannot allege that BCBSI has market power in the tying and/or tied product, which are hospital services. The case law firmly holds that the plaintiff must show that the "seller has 'market power' in the market for the tying product." *Sheridan v. Marathon Petroleum Co. LLC*, 530 F.3d 590, 594 (7th Cir. 2008) (citing *Ill. Tool Works*, 547 U.S. at 35; *Jefferson Parish Hospital Dist. No. 2 v. Hyde*, 466 U.S. 2, 15-18 (1984)). The fact that plaintiff delineated its markets as services paid for by commercial insurers, still does not give BCBSI market power in the services at issue -- inpatient and outpatients services, because BCBSI is not a seller of these services. The allegation that BCBSI has market power in the health insurance market is irrelevant. *See Rick-Mik Enterprises, Inc. v. Equilon Enterprises LLC*, 532 F.3d 963, 971-72 (9th Cir. 2008). Plaintiff has simply failed to allege a requisite element of its claim against BCBSI. Plaintiff's argument that BCBSI received a direct economic benefit from the exclusion effectuated by the tie in the form of discounted rates for inpatient services from SIH does not cure the deficiency or respond to the relevant case law requiring a showing of defendant's market power

in the particular product market.  Furthermore, even if plaintiff were to amend its pleadings to include all possible payers, it would not save plaintiff's tying claim against BCBSI.  Accordingly, Count VII against BCBSI, tying in violation of the Sherman Act, is **DISMISSED WITH PREJUDICE**.

Similarly, to the extent that MHC attempts to raise a monopolization claim against BCBSI in Count IX, that claim as to BCBSI is **DISMISSED WITH PREJUDICE**.  The Seventh Circuit has previously left undisturbed a district court's determination that a health insurance provider "cannot, as a matter of law, monopolize or attempt to monopolize the hospital services industry because [the health insurance provider] has never and does not now compete in that market." *Ball Mem'l Hosp., Inc. v. Mut. Hosp. Ins. Inc.*, 603 F.Supp. 1077, 1087 (S.D. Ind. 1985) *aff'd*, 784 F.2d 1325 (7th Cir. 1986).

### C. Monopolization Claim Against Defendant SIH

Section 2 of the Sherman Act "forbids not the intentional pursuit of monopoly power but the employment of unjustifiable means to gain that power."  *Endsley v. City of Chicago*, 230 F.3d 276, 282 (7th Cir. 2000).  There are two elements to a monopoly claim: "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"  *Id*. (quoting *Eastman Kodak Co. v. Image Technical Servs.*, 504 U.S. 451, 481 (1992).

In light of the Court's ruling on the "relevant market" aspect of plaintiff's other Sherman Act claims, the Court need not consider, at this juncture, whether plaintiff has adequately plead that SIH acquired or maintained its alleged monopoly position unlawfully.   To analyze plaintiff's claim, the Court must first determine whether SIH has monopoly power in the relevant market, which cannot be determined until plaintiff adequately pleads a relevant market.  Based on the Court's relevant market ruling, plaintiff's claim based on a violation of Section 2 of the Sherman Act, Count IX, is **DISMISSED WITHOUT PREJUDICE.**

### III.   ILLINOIS ANTITRUST CLAIMS

"Illinois law provides that its courts should use the construction of federal antitrust law by federal courts to guide their construction of those state antitrust laws that are substantially similar to federal antitrust law." *State of Ill., ex rel. Burris v. Panhandle Eastern Pipe Line Co*., 935 F.2d 1469, 1480 (7th Cir. 1991). In other words, federal courts (and Illinois state courts) use federal law in construing provisions of the Illinois Antitrust Law that are substantially similar to federal law. *See, id*.  Plaintiff does not dispute that the provisions of the Illinois Antitrust law at issue in this case are substantially similar to the relevant federal law.  Accordingly, plaintiff's Illinois Antitrust claims against defendants, to the extent that each is based upon the portion of the Illinois law that is substantially similar to the Clayton Act (Counts III, IV, VI, and VII) are **DISMISSED WITH PREJUDICE**, and plaintiff's claims against defendants, to the extent that each is based upon the portion of Illinois law that is substantially similar to the Sherman

Act (Counts III, IV, VI, and VII) are **DISMISSED WITHOUT PREJUDICE**.

Plaintiff's Illinois Antitrust claim against BCBSI based on tying (Count VIII) is

**DISMISSED WITH PREJUDICE**, in accordance with the Court's ruling on the

federal claim supra.

### IV. TORTIOUS INTERFERENCE WITH A BUSINESS EXPECTANCY

Under Illinois law, the elements of a claim of tortious interference with a

business expectancy are "'(1) the plaintiff's reasonable expectation of entering into

a valid business relationship; (2) the defendant's knowledge of the plaintiff's

expectancy; (3) the purposeful interference by the defendant that prevents the

plaintiff's legitimate expectancy from ripening into a valid business relationship;

and (4) damages to the plaintiff resulting from such interference.'" *Botvinick v.*

*Rush University Medical Center*, 574 F.3d 414, 417 (7th Cir. 2009) (quoting

*Fellhauer v. City of Geneva*, 568 N.E.2d 870, 878 (Ill. 1991)).

Defendant BCBSI asserts that plaintiff's tortious interference allegations

must be dismissed because plaintiff claims that BCBSI improperly caused in-

network physicians and plan participants, with whom BCBSI had an existing,

ongoing, relationship, not to use MHC's out-of-network surgical center. BCBSI

asserts that a party may not tortiously interfere with its own relationships, even if

another party may be affected. BCBSI asserts that it is a party to the very

relationships with which MHC asserts BCBSI interfered. Specifically, MHC

alleged that BCBSI informed its in-network physicians (parties to BCBSI provider

contracts) and plan member-patients (parties to health benefit contracts) that

patients would pay a higher out-of-network rate if they utilized MHC (an out-of-network provider).  BCBSI also asserts that its actions are privileged because of its ongoing relationship with the relevant physicians and patients, and therefore, the tortious interference claims must be dismissed.

Plaintiff asserts that BCBSI misrepresents the relationships at issue, and looks to the wrong relationship in taking its position.  Plaintiff asserts that BCBSI is not a party to the "business expectancy" of plaintiff.  Specifically, plaintiff points to the fact that BCBSI has threatened its network physicians that if they permit a patient with out of network benefits (PPO benefits), BCBSI will terminate the physician's network agreement.  In that case, MHC asserts that BCBSI is a third party and its efforts to coerce medical staff to take cases elsewhere is actionable.

Plaintiff fails to address the fact, however, that BCBSI is taking action pursuant to already existing relationships, in that an "in-network" physician already has a contractual relationship with BCBSI.  "In order to maintain a cause of action for tortious interference with a contract or prospective contractual relationship, the tortfeasor must be a third party to the contractual relationship." *Quist v. Board of Trustees of Community College Dist. No. 525*, 629 N.E.2d 807, 811 (Ill. App. Ct. 1994).  Any in-network physician or patient covered by BCBSI has an existing contractual relationship with BCBSI, and plaintiff, as a service provider, could only be paid for services rendered by or to these individuals through its existing contractual agreements.  In this scenario, BCBSI cannot be a non-party to the business expectancy relationships alleged by plaintiff, and any

amendment would contradict the allegations already set forth, and would be futile.  Accordingly, plaintiff's claim against BCBSI for tortious interference with a business expectancy, Count XI is **DISMISSED WITH PREJUDICE.**

## CONCLUSION

Defendant's motions to dismiss (Docs. 22 and 25) are **GRANTED IN PART** and **DENIED IN PART** as follows:

To the extent that Counts I, II, V, VII, and X, of plaintiff's amended complaint attempt to bring claims pursuant to Sections 2 or 3 of the Clayton Act, those claims are **DISMISSED WITH PREJUDICE** for failure to state a claim upon which relief may be granted.

Plaintiff's Sherman Act claims as to defendant SIH are **DISMISSED WITHOUT PREJUDICE** (Counts I, V, and IX).  As to defendant BCBSI, plaintiff's Sherman Act claim regarding exclusive dealing (Count II) is **DISMISSED WITHOUT PREJUDICE**, and plaintiff's claims regarding tying (Count VII) and monopolization (Count IX) are **DISMISSED WITH PREJUDICE**.

Plaintiff's Illinois Antitrust claims against defendants, to the extent that each is based upon the portion of the Illinois law that is substantially similar to the Clayton Act (Counts III, IV, VI, and VII) are **DISMISSED WITH PREJUDICE.** Plaintiff Illinois Antitrust claims against defendant SIH, to the extent that each is based upon the portion of Illinois law that is substantially similar to the Sherman Act (Counts III and VI), are **DISMISSED WITHOUT PREJUDICE.**  Plaintiff Illinois Antitrust claims against defendant BCBSI, to the extent that each is based

31

upon the portion of Illinois law that is substantially similar to the Sherman Act based upon exclusive dealing (Count IV) is **DISMISSED WITHOUT PREJUDICE,** and based upon tying (Count VIII) is **DISMISSED WITH PREJUDICE.**

Plaintiff's claim against BCBSI for tortious interference with a business expectancy, Count XI, is **DISMISSED WITH PREJUDICE.**

Plaintiff is granted leave to file a second amended complaint on or before September 23, 2013.

**IT IS SO ORDERED.**

Signed this 26th day of August, 2013.

Digitally signed by
David R. Herndon
Date: 2013.08.26
15:45:14 -05'00'

_____

**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**