# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### Benton Division

| | |
|---|---|
| Marion HealthCare, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No: 12 CV 0087-SMY-PMF |
| | ) |
| Southern Illinois Healthcare,[1] | ) |
| | ) |
| Defendant. | ) |

## THIRD AMEDED COMPLAINT
### Antitrust

Plaintiff Marion HealthCare, L.L.C.  brings this civil action alleging primarily violations of federal and state antitrust law and seeking damages and further relief enjoining defendant Southern Illinois HealthCare ("SIH) from entering into, maintaining or enforcing contracts that prevent commercial insurance companies and similar business organizations including, but not limited to BlueCross and Blue Shield of Illinois, (BlueCross), Health Alliance Medical Plans (Health Alliance), Group Health Plan (GHP), PHCS, HFN, St. Mary's Med. Center of Evansville (dba, SelectHealth),  and Great-West HealthCare of Illinois, Inc. (Great-West)  from contracting with SIH's competitors, including Plaintiff,  under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and the Illinois Antitrust Act, and to otherwise remedy the effects of their unlawful conduct.

In short, through exclusionary agreements and ongoing related conduct, including exclusive dealing, tying and monopolization, Defendant has substantially suppressed

---

[1] Plaintiff's Second Amended Complaint includes counts against Health Care Service Corporation, d/b/a Blue Cross and Blue Shield of Illinois. Due to the Court's dismissal of those counts, they are not repeated here but are incorporated by reference.  Plaintiff reserves all rights to challenge that dismissal in any subsequent appeal.

competition for outpatient surgical services in a specified, relevant market in southern Illinois.  By foreclosing competition in this way, Defendant's conduct is harming healthcare consumers through higher prices, diminished choice of outpatient service providers, reduced innovation, and higher barriers to entry for competing service providers – classic indicia of harm to competition which the antitrust laws are intended to remedy.

Plaintiff alleges as follows:

## I. NATURE OF THE ACTION

1. Plaintiff alleges relevant product markets, in the alternative, the first set encompassing the second.  The first set of relevant product consists of (a) general acute-care inpatient hospital services, including pediatric services and neonatal care services (generally referred to as "hospital services"), and (b)  outpatient surgical services, where both (a) and (b) services may be reimbursed by any payors, including commercial insurance, government payors (e.g., Medicare, Medicaid) and self-pay.  Alternatively, as discussed below, the second set of relevant product markets – submarkets of the first set of relevant markets but relevant markets in their own right – consists of (1) general acute-care inpatient hospital services, including pediatric services and neonatal care services (generally referred to as "hospital services") reimbursed by commercial health insurers, and (2) outpatient surgical services reimbursed by commercial health insurers.

2. The relevant geographic market comprises Williamson County and Jackson County, Illinois and the surrounding area.  Defendant SIH has monopoly power in the

relevant product markets in Williamson County and Jackson County, Illinois and the surrounding area.

3.      In the relevant geographic market, SIH has approximately a 77% share of the market for inpatient hospital services reimbursed by commercial insurers and a greater than 85.3% share of the market for outpatient services reimbursed by commercial insurers.  Similarly, SIH has approximately a 72.3% share of the market for inpatient hospital admissions and 75% market share for inpatient days reimbursed by all payors.  SIH has a greater than 77.2% share of the market for outpatient services reimbursed by all payors.  Most all health insurance companies in the relevant geographic market consider SIH a "must-have" hospital system for health plans because it is by far the largest hospital system in the region and the only local provider of certain essential services.

4.      SIH has maintained its monopoly power in the relevant markets by entering into contracts with commercial health insurer(s), including, but not limited to BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West which exclude competitors in the relevant geographic market from the insurers' health-care provider networks ("exclusionary contracts"). These exclusionary contracts effectively prevent insurers from contracting with other health-care facilities that compete with SIH, including Plaintiff Marion HealthCare, L.L.C. ("Marion HealthCare").

Most patients must pay SIH substantially more for its outpatient surgical services, as compared to having the procedure performed in an independent (i.e., non-SIH-partially or wholly owned) freestanding outpatient setting.  SIH's exclusionary

contracts effectively prevent members of the public from accessing competing full service outpatient surgical services in a cost-efficient manner.

5.      SIH's exclusionary contracts violate the antitrust laws and have reduced competition and enabled SIH to maintain and extend its monopoly power in the provision of outpatient surgical services, to the detriment of the public. By means of these contracts and its monopoly power, SIH has (1) delayed and prevented the expansion and entry of SIH's competitors, likely leading to higher health-care costs and higher health insurance premiums; (2) limited price competition for price-sensitive patients, likely leading to higher health-care costs for those patients; and (3) reduced quality competition between SIH and its competitors. In this case, there is no valid procompetitive business justification for SIH's exclusionary contract.

6.      SIH's exclusionary contracts constitute illegal tying and exclusive dealing in violation of Sections 1 of the Sherman Act and corresponding state law and also have enabled SIH to maintain and extend its monopoly power unlawfully in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

7.      With respect to the commercial insurance carriers known to have entered into exclusive dealing arrangements with SIH,

     a.   The exclusivity agreements with BlueCross are attached hereto and incorporated herein as **Exhibit A (Bates No. SIH 0101, 0271, 0332, and 0434 and 0493))**   BlueCross is a division of Health Care Service Corporation, a Mutual Legal Reserve Company, an independent licensee of the BlueCross and BlueShield Association. BlueCross is the largest health insurance company in Illinois, providing more than 6.5 million members with health

insurance coverage, including Illinois residents of Williamson and Jackson
Counties and the local surrounding areas. BlueCross is recognized by
Defendant as the largest payer in Southern Illinois (See attached **Exhibit B
(Bates No. SIH 7227))**   There are approximately 12.9 million citizens in
Illinois, almost half of whom are covered by some type of BlueCross primary
insurance plan. BlueCross is the dominant health insurer in Illinois and
Williamson County and Jackson County and the surrounding area.  Further,
taking into account secondary or supplemental insurance plans, well over half
of all citizens are covered by some type of BlueCross plan.

   According to an Illinois Department of Insurance report, in 2010
BlueCross held a dominant market share of the group health insurance market,
receiving 47.76% of all premiums for insurance companies selling group
health plans in the state, while  the next closest health insurance company
competitor had a market share of 6.46%; BlueCross received 49.40% of all
premiums paid for individual Life and Property and Casualty insurance, while
a subsidiary, HCSC Insurance Services Company, received another 6.27%;
and, finally BlueCross had a market share of 98.64% of the premiums for all
insurance companies in Illinois related to direct premiums for federal
employee health plans.

   An article published July 17, 2012 in *Crain's Chicago Business* cites
BlueCross as holding 48.13% of the Illinois market in accident and health
insurance in 2011, according to an annual report of the National Association
of Insurance Commissioners. Its nearest competitor was United HealthCare of

Illinois, with 10.24% of the Illinois market in accident and health insurance in 2011, according to the report. However, in the relevant product market as defined below, United HealthCare's market penetration has been inhibited by an agreement entered into by SIH with HFN, in which, in exchange for exclusivity, SIH agreed not to contract its "must-have" hospitals with United HealthCare or Coalition America. (See attached **Exhibit C (Bates No. SIH 7578-7579)**)

b.  The exclusivity agreement with Health Alliance is attached hereto and incorporated herein as **Exhibit D (Bates No. SIH 7524**) Health Alliance is believed to be the third largest payor in the Relevant Geographic Market. Health Alliance is the largest health plan in downstate Illinois, serving more than 400,000 members in Illinois, Iowa, Nebraska, and Washington. In Illinois, the company offers employer group health plans, individual health plans, Medicare replacement plans, Stand-Alone Prescription Drug plans, Medicaid replacement plans, Dual-Eligible (Medicare and Medicaid) plans, State of Illinois Employee plans, and State of Illinois Retiree plans through Total Retiree Advantage Illinois.

c.  GHP, PHCS, HFN, SelectHealth, and Great-West are smaller payors in the Relevant Geographic Market. The disclosed exclusivity agreements with these companies are attached hereto and incorporated herein as:

| Exhibit | Bates No. | Insurance Company |
|---------|-----------|-------------------|
| E | SIH 7454 | GHP |
| F | SIH 7640 | PHCS |
| G | SIH 7583 | HFN |
| H | SIH 7488 | Great-West |

The SelectHealth agreement has not yet been produced. Each insures, administers or lends its network to other plans covering a significant number of covered lives in the market. The combination of these smaller plans and the two market leaders, BlueCross and Health Alliance, are believed to foreclose more than 50% of the relevant product market described below.

8.  SIH's federal IRS tax returns filed November 11, 2011 show annual consolidated net patient revenues in excess of $357 million for 2010, with profits shown at line 19 (revenue less expenses) of $44,617,208.00.

## II. DEFENDANTS, JURISDICTION, VENUE AND INTERSTATE COMMERCE

9.  Defendant SIH is a nonprofit corporation organized and existing under the laws of the State of Illinois, with its principal place of business in Carbondale, Illinois. As a non-profit corporation, Defendant SIH receives substantial benefits from Illinois taxpayers in that it is allowed to operate its business without paying state or federal income taxes and it does not pay property taxes.

10. The commercial insurance companies with which Defendant has entered into exclusive dealing arrangements directly or indirectly provide and/or administer individual and group health insurance coverage to Illinois citizens throughout the state, including Williamson and Jackson Counties, Illinois.

11. Plaintiff brings this action pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain violations by SIH and BlueCross of Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1, 2, and pursuant to the Illinois Antitrust Act (740 ILCS 10).

12.     This Court has subject matter jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337(a), and 28 U.S.C. § 1367.

13.     SIH maintains its principal place of business and transacts business in this District. SIH entered into the agreements at issue in this District and committed the acts complained of in this District.  SIH's conduct has had anticompetitive effects and will continue to have anticompetitive effects in this District.  Consequently, this Court has personal jurisdiction over the Defendant, and venue is proper in this District under 15 U.S.C. § 22, and 28 U.S.C. § 1391.

14.     SIH is engaged in, and its activities substantially affect, interstate trade and commerce. It contracts with governmental and commercial health insurers located inside and outside of Illinois to be included in their provider networks. These providers of governmental and commercial health insurance make substantial payments to SIH in interstate commerce.

### III.     RELEVANT MARKETS

### A.  Relevant Product Market – Inpatient and Outpatient Services as Reimbursed by All Payors

**1) The sale of inpatient hospital services**

15.     The sale of inpatient hospital services is a relevant product market.

16.     Inpatient hospital services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient. Inpatient hospital services *exclude* (1) services at hospitals that serve solely children,

military personnel or veterans; (2) services at outpatient-only facilities that provide same-day service only; and (3) psychiatric, substance abuse and rehabilitation services. Although individual inpatient hospital services are not substitutes for each other (*e.g.*, pediatric, obstetrics and cardiac services are not substitutes for each other), the various individual inpatient hospital services can be aggregated for analytic convenience.

17.     The market for the sale of inpatient hospital services excludes outpatient services because patients cannot substitute outpatient services for inpatient services in response to a sustained price increase. There are no other reasonably interchangeable services for inpatient hospital services.

18.     While patients receiving inpatient hospital services ultimately are financially responsible to the provider for those services, the overwhelming majority of patients are reimbursed for those financial obligations by one or more third-party payors. Third-party payors include commercial insurance companies and government payors.

19.     Commercial health insurers include managed-care organizations (e.g. BlueCross, Health Alliance, HealthLink, Aetna, United Healthcare, CIGNA, SelectHealth, and Great-West or other HMOs or PPOs), rental networks (such as HealthLink, BlueCross, Health Alliance, GHP, PHCS, and HFN), and self-funded plans. Rental networks serve as a secondary network used by health insurance companies looking for network coverage or discounts outside of their own networks or by self-insured employers; they are used by small and mid-sized health insurance companies to offer clients national coverage. Self-funded plans may access provider networks through managed-care organizations or rental networks. Although not all of these are risk-

bearing entities, they can be referred to collectively as "commercial health insurers." BlueCross and various competing commercial health insurance providers sell both group and individual health insurance plans; however, it should be noted that group plans, if available to healthcare consumers, are far more attractive, and on information and belief far more prevalent, because of their lower premiums. Many commercial health insurance providers, including BlueCross and Health Alliance, also sell Medicare supplement plans and Medicare replacement plans to patients who are or otherwise would be Medicare enrollees.

20.     Unlike most other commercial service transactions in the economy, the cost for inpatient hospital services is not exclusively determined by the provider or patient and like services can be drastically different in price, depending upon the third-party payor.

21.     Commercial insurance plans generally reimburse at a much higher rate than government payors such as Medicare or Medicaid.   Inpatient hospital providers will often negotiate reimbursement rates with various commercial insurance carriers.

22.     Reimbursement rates by Medicare, Medicaid and TRICARE are fixed and non-negotiable.

23.     Reimbursements by Medicare, Medicaid and TRICARE are often at or below cost and thus only marginally, if at all, contribute to a producer's viability.  For providers who elect to provide services to Medicare, Medicaid and TRICARE enrollees, at or below-cost reimbursements for services by Medicare, Medicaid and TRICARE must be offset by the substantially greater reimbursements by commercial insurers if the provider is to remain commercially viable.

24.     Although inpatient services reimbursed by government payors may be taken into account as constituting a broader relevant market which also includes services reimbursed by commercial insurance, as a practical matter the government payors provide a relatively insignificant source of financial input for providers of inpatient services.

25.     Consequently, a hypothetical monopolist provider of inpatient hospital services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

26.     Conversely, a hypothetical provider of inpatient hospital services foreclosed from adequate reimbursements from commercial health insurers to offset losses from Medicare, Medicaid and TRICARE reimbursements would not be financially viable.

**2) The sale of outpatient surgical services**

27.     The sale of outpatient surgical services is a relevant product market.  Just as for inpatient hospital services, patients receiving outpatient surgical services ultimately are financially responsible to the provider for those services, but the overwhelming majority of patients are reimbursed for those financial obligations by one or more third-party payors.  Third-party payors include commercial insurance companies and government payors.

28.     Commercial insurers and similar companies generally negotiate reimbursement rates with providers for outpatient surgical services so that when a covered individual incurs expenses for covered medical services, the reimbursement paid by the insurance carrier is at a predetermined rate.  In this fashion, the insurance carriers

serve as the *de facto* buyer of covered outpatient surgical services and the providers (doctors, hospitals, surgery centers, laboratories, etc.) are the sellers.

29.     Outpatient surgical services are a broad group of surgical diagnostic and surgical treatment services that do not require an overnight stay in a hospital. Outpatient surgical services are typically performed in a hospital *or* other specialized facility, such as a freestanding ambulatory surgery center that is licensed to perform outpatient surgery. (The term "outpatient surgical services," as commonly understood and as used herein, unless otherwise specified, therefore includes both outpatient surgical services performed in a hospital and outpatient surgical services performed in other specialized facilities, typically freestanding ambulatory surgery centers.) Outpatient surgical services are distinct from procedures routinely performed in a doctor's office. Outpatient surgical services *exclude* inpatient services at hospitals or other facilities that serve solely children, military personnel or veterans. Although individual outpatient surgical services are not substitutes for each other (*e.g.*, orthopedic and gastroenterological surgical services are not substitutes for one another), the various individual outpatient surgical services can be aggregated for analytic convenience.

30.     The market for the sale of outpatient surgical services excludes inpatient hospital services because health plans and patients would not substitute inpatient care for outpatient surgical services in response to a sustained price increase. There are no other reasonably interchangeable services for outpatient surgical services. As an example, freestanding ambulatory surgical centers cannot provide inpatient hospital services. Essentially, ambulatory surgical centers provide only outpatient surgical services.

12

31.     Unlike most other commercial service transactions in the economy, the cost for outpatient surgical services is not exclusively determined by the provider or patient and like services can be drastically different in price, depending upon the third-party payor.

32.     Commercial insurance plans generally reimburse at a much higher rate than government payors such as Medicare or Medicaid.   Outpatient surgical providers will often negotiate reimbursement rates with various commercial insurance carriers.

33.     Reimbursement rates by Medicare, Medicaid and TRICARE are fixed and non-negotiable.

34.     Reimbursements by Medicare, Medicaid and TRICARE are often at or below cost and thus only marginally, if at all, contribute to a producer's viability.  For providers who elect to provide services to Medicare, Medicaid and TRICARE enrollees, at or below-cost reimbursements for services by Medicare, Medicaid and TRICARE must be offset by the substantially greater reimbursements by commercial insurers if the provider is to remain commercially viable.

35.     Although outpatient services reimbursed by government payors may be taken into account as constituting a broader relevant market which also includes services reimbursed by commercial insurance, as a practical matter the government payors provide a relatively insignificant source of financial input for providers of outpatient services.

36.     There are no reasonable substitutes or alternatives to outpatient surgical services sold to commercial health insurers. A healthcare provider's negotiations with commercial health insurers are separate from the process used to determine the rates

paid by government payors, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for outpatient surgical services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance.

37.     Consequently, a hypothetical monopolist provider of outpatient surgical services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

38.     Conversely, a hypothetical provider of outpatient surgical services foreclosed from adequate reimbursements from commercial health insurers to offset losses from Medicare, Medicaid and TRICARE reimbursements would not be financially viable.

39.     Consequently, although government payors may be viewed as included in a larger relevant market also including commercial insurance, government payors provide relatively negligible financial input to outpatient service providers and do not meaningfully constrain their competitive behavior.

### B.     Relevant Product Market – Inpatient and Outpatient Services as Reimbursed by Commercial Insurers

**1) The sale of inpatient hospital services to commercial health insurers**

40.     The sale of inpatient hospital services reimbursed by commercial health insurers is a relevant product market.

41.     Inpatient hospital services are a broad group of medical and surgical diagnostic and treatment services that include an overnight stay in the hospital by the patient. Inpatient hospital services *exclude* (1) services at hospitals that serve solely children, military personnel or veterans; (2) services at outpatient-only facilities that provide same-day service only; and (3) psychiatric, substance abuse and rehabilitation services. Although individual inpatient hospital services are not substitutes for each other (*e.g.*, pediatric, obstetrics and cardiac services are not substitutes for each other), the various individual inpatient hospital services can be aggregated for analytic convenience.

42.     While patients receiving inpatient hospital services ultimately are financially responsible to the provider for those services, the overwhelming majority of patients are reimbursed for those financial obligations by one or more third-party payors.  The market for the sale of inpatient hospital services reimbursed by commercial health insurers excludes outpatient services because health plans and patients would not substitute outpatient services for inpatient services in response to a sustained price increase. There are no other reasonably interchangeable services for inpatient hospital services.

43.     Unlike most other commercial service transactions in the economy, the cost for inpatient hospital services is not exclusively determined by the provider or patient and like services can be drastically different in price, depending upon the third-party payor.

44. Commercial insurance plans generally reimburse at a much higher rate than government payors such as Medicare or Medicaid. Inpatient hospital providers will often negotiate reimbursement rates with various commercial insurance carriers.

45. Commercial health insurers include managed-care organizations (e.g. BlueCross, Health Alliance, HealthLink, Aetna, United Healthcare, CIGNA, SelectHealth, and Great-West or other HMOs or PPOs), rental networks (such as HealthLink, BlueCross, Health Alliance, GHP, PHCS, and HFN), and self-funded plans. Rental networks serve as a secondary network used by health insurance companies looking for network coverage or discounts outside of their own networks or by self-insured employers; they are used by small and mid-sized health insurance companies to offer clients national coverage. Self-funded plans may access provider networks through managed-care organizations or rental networks. Although not all of these are risk-bearing entities, they can be referred to collectively as "commercial health insurers." Commercial health insurers *do not* include government payors (Medicare, Medicaid, and TRICARE). BlueCross, Health Alliance, and various competing commercial health insurance providers sell both group and individual health insurance plans; however, it should be noted that group plans, if available to healthcare consumers, are far more attractive, and on information and belief far more prevalent, because of their lower premiums.

46. The market for the sale of inpatient hospital services reimbursed by commercial health insurers *excludes* sales of such services to government payors. The primary government payors are the federal government's Medicare program (coverage for the elderly and disabled), the joint federal and state Medicaid programs (coverage for

16

low-income persons), and the federal government's TRICARE program (coverage for military personnel and families). The federal government sets the rates and schedules at which the government pays health-care providers for services provided to individuals covered by Medicare, Medicaid, and TRICARE.

47.     Reimbursement rates by Medicare, Medicaid and TRICARE are fixed and non-negotiable.

48.     In contrast, commercial health insurers negotiate rates with health-care providers and sell health insurance policies to organizations and individuals, who pay premiums for the policies. Insurers generally negotiate discounted but above-cost rates with providers so that when a covered individual incurs expenses for covered medical services, the reimbursement paid by the insurance carrier is at a discounted rate.  In this fashion, the insurance carriers serve as the buyer of covered health care services and the providers (doctors, hospitals, surgery centers, laboratories, etc.) are the sellers.  When an individual covered under such policy incurs expenses for medical care, the commercial health insurer pays a portion of those incurred expenses, usually directly to the provider, subject to the terms and conditions of the insurance policy. Generally, the rates that commercial health insurers pay health-care providers are substantially higher than those paid by government payors (Medicare, Medicaid, and TRICARE). Additionally, the state of Illinois contracts for the purchase of commercial health insurance for employees employed by the state, including, among others, state workers, teachers, lawmakers, judges and a host of other individuals.

49.     There are no reasonable substitutes or alternatives to inpatient hospital services sold to commercial health insurers. A healthcare provider's negotiations with

commercial health insurers are separate from the process used to determine the rates paid by government payors, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for inpatient hospital services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance.

50.     Government payors provide a relatively insignificant source of financial input for providers of inpatient services.  Reimbursements by Medicare, Medicaid and TRICARE are often at or below cost and thus only marginally, if at all, contribute to a producer's viability.  For providers who elect to provide services to Medicare, Medicaid and TRICARE enrollees, at or below-cost reimbursements for services by Medicare, Medicaid and TRICARE must be offset by the substantially greater reimbursements by commercial insurers if the provider is to remain commercially viable

51.     Consequently, a hypothetical monopolist provider of inpatient hospital services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

52.     Conversely, a hypothetical provider of inpatient hospital services foreclosed from adequate reimbursements from commercial health insurers to offset losses from Medicare, Medicaid and TRICARE reimbursements would not be financially viable.

**2) The sale of outpatient surgical services to commercial health insurers**

53.     The sale of outpatient surgical services reimbursed by commercial health insurers

is a relevant product market.  Just as for inpatient hospital services, insurers generally

negotiate discounted rates with providers for outpatient surgical services so that when

a covered individual incurs expenses for covered medical services, the reimbursement

paid by the insurance carrier is at a discounted rate.  In this fashion, the insurance

carriers serve as the buyer of covered outpatient surgical services and the providers

(doctors, hospitals, surgery centers, laboratories, etc.) are the sellers.

54.     Outpatient surgical services are a broad group of surgical diagnostic and surgical

treatment services that do not require an overnight stay in a hospital. Outpatient

surgical services are typically performed in a hospital *or* other specialized facility,

such as a freestanding ambulatory surgery center that is licensed to perform outpatient

surgery. (The term "outpatient surgical services," as commonly understood and as

used herein, unless otherwise specified, therefore includes both outpatient surgical

services performed in a hospital and outpatient surgical services performed in other

specialized facilities, typically freestanding ambulatory surgery centers.) Outpatient

surgical services are distinct from procedures routinely performed in a doctor's office.

Outpatient surgical services *exclude* inpatient services at hospitals or other facilities

that serve solely children, military personnel or veterans. Although individual

outpatient surgical services are not substitutes for each other (*e.g.*, orthopedic and

gastroenterological surgical services are not substitutes for one another), the various

individual outpatient surgical services can be aggregated for analytic convenience.

55.     The market for the sale of outpatient surgical services to commercial health

insurers excludes inpatient hospital services because health plans and patients would

not substitute inpatient care for outpatient surgical services in response to a sustained price increase. There are no other reasonably interchangeable services for outpatient surgical services. As an example, freestanding ambulatory surgical centers cannot provide inpatient hospital services. Essentially, ambulatory surgical centers provide only outpatient surgical services.

56.     Unlike most other commercial service transactions in the economy, the cost for outpatient surgical services is not exclusively determined by the provider or patient and like services can be drastically different in price, depending upon the third-party payor.

57.     Commercial insurance plans generally reimburse at a much higher rate than government payors such as Medicare or Medicaid.   Outpatient surgical providers will often negotiate reimbursement rates with various commercial insurance carriers.

58.     Reimbursement rates by Medicare, Medicaid and TRICARE are fixed and non-negotiable.

59.     Government payors provide a relatively insignificant source of financial input for providers of outpatient surgical services.  Reimbursements by Medicare, Medicaid and TRICARE are often at or below cost and thus only marginally, if at all, contribute to a producer's viability.  For providers who elect to provide services to Medicare, Medicaid and TRICARE enrollees, at or below-cost reimbursements for services by Medicare, Medicaid and TRICARE must be offset by the substantially greater reimbursements by commercial insurers if the provider is to remain commercially viable.

60.     There are no reasonable substitutes or alternatives to outpatient surgical services sold to commercial health insurers. A healthcare provider's negotiations with commercial health insurers are separate from the process used to determine the rates paid by government payors, and health-care providers could, therefore, target a price increase just to commercial health insurers. Commercial health insurers cannot shift to government rates in response to an increase in rates for outpatient surgical services sold to commercial health insurers, and patients who are ineligible for Medicare, Medicaid, or TRICARE cannot substitute those programs for commercial health insurance in response to a price increase for commercial health insurance.

61.     Consequently, a hypothetical monopolist provider of outpatient surgical services sold to commercial health insurers or patients not covered by any governmental insurance programs could profitably maintain supracompetitive prices for those services over a sustained period of time.

62.     Conversely, a hypothetical provider of outpatient surgical services foreclosed from adequate reimbursements from commercial health insurers to offset losses from Medicare, Medicaid and TRICARE reimbursements would not be financially viable.

### C. Relevant Geographic Market

63.     The relevant geographic market for each of the relevant product markets alleged above is Williamson and Jackson Counties, Illinois and portions of the adjacent local geographic areas in close proximity to these two counties. The vast majority of patients residing in Williamson and Jackson Counties and adjacent local areas primarily utilize hospitals in these two counties when hospital inpatient care is required, as opposed to leaving the area to receive inpatient hospital care outside

these counties. Similarly, the vast majority of patients residing in Williamson and Jackson Counties and adjacent local areas utilize outpatient surgical services from facility providers located in these two counties, rather than traveling out of those counties for outpatient surgery.  Geographically, citizens in Williamson and Jackson Counties and adjacent local areas have the option to receive inpatient care within the two-county area, or be forced to drive in excess of an hour or more to hospitals located outside the region for alternative care. The great majority of citizens in Williamson and Jackson Counties receive hospital treatment locally at one of the four hospitals in the two-county area. Portions of the population of counties in close proximity to Williamson and Jackson County also utilize the hospital services in the two-county area. There are certainly no "bright line" demarcation boundaries delineating geographic market borders in the field of healthcare, beyond which patients seek medical care in other locations. Artificial county line boundaries do not adequately delineate geographic market borders in healthcare.  However, in response to a small but significant and non-transitory increase in price of inpatient and outpatient surgical services, a significant percentage of patients would not be prompted to seek services beyond Williamson and Jackson Counties.  For purposes of this complaint, the relevant geographic market is no larger than Williamson and Jackson Counties and populations in border counties in close proximity to those two counties.

64.     According to the 2010 estimates of the Census Bureau, Jackson County has a population of about 60,218 and Williamson County has a population of about 66,357. Citizens from many local surrounding rural counties also utilize healthcare services in

both Williamson and Jackson Counties.  The population of citizens in the relevant geographic market likely exceeds 200,000 people.

65.     Commercial health insurers contract to purchase inpatient hospital services and outpatient surgical services in the geographic area in which their health plan beneficiaries are likely to seek medical care. Patients typically seek medical care close to their homes or workplaces. Relatively few patients who live in the Illinois counties of Jackson and Williamson and the local surrounding geographic area in close proximity to these two counties travel outside this area to seek inpatient hospital services or outpatient surgical services. Commercial health insurers that sell policies to beneficiaries in Jackson County and Williamson County and the local surrounding geographic area in close proximity to these two counties cannot reasonably purchase inpatient hospital services or outpatient surgical services outside Jackson County and Williamson County as an alternative to serve those beneficiaries. Consequently, hospitals and health-care facilities outside Jackson County and Williamson County and surrounding area do not compete with health-care providers located in Jackson County and Williamson County and surrounding area for the sale of the relevant products in a manner that would constrain the pricing or other behavior of Jackson County and Williamson County and surrounding area healthcare providers.

66.     Competition for the sale of inpatient hospital services from providers located outside Jackson County and Williamson County and the surrounding area would not be sufficient to prevent a hypothetical monopolist provider of inpatient hospital services to commercial health insurers located in the Jackson County and Williamson

County and the surrounding geographic area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

67.    Competition for the sale of outpatient surgical services from providers located outside Jackson County and Williamson County and the surrounding area would not be sufficient to prevent a hypothetical monopolist provider of outpatient surgical services in Jackson County and Williamson County and surrounding area from profitably maintaining supracompetitive prices for those services over a sustained period of time.

### IV. HOSPITALS AND OUTPATIENT SURGICAL FACILITIES IN THE WILLIAMSON AND JACKSON COUNTY, ILLINOIS AREAS

### A. Acute-Care Hospitals

68.    There are four general acute-care hospitals in Jackson County and Williamson County:

    a.  Memorial Hospital of Carbondale, Jackson County (owned by SIH),

    b.  Herrin Hospital in Herrin, Williamson County (owned by SIH),

    c.  St. Joseph Memorial Hospital in Murphysboro, Jackson County (owned by SIH) and

    d.  Heartland Regional Medical Center in Marion, Williamson County (owned by Community Health Systems).

### a. Memorial Hospital of Carbondale

69.    Memorial Hospital of Carbondale is an approximately 132-bed facility located in Carbondale, Illinois. It is the largest SIH facility and serves southern Illinois as a regional medical center. It is a general acute-care hospital that offers a wide range of

inpatient and outpatient services. Memorial Hospital of Carbondale has eight surgical operating rooms, two endoscopy rooms, a laboratory, a 24-hour emergency department, a pediatric unit and neonatology services, among other services. It offers comprehensive cardiac care and has a childbirth center. SIH offers the only Level II-plus neonatal intensive care unit south of Springfield, Illinois and the only pediatric unit in southern Illinois. Memorial Hospital of Carbondale is a private nonprofit hospital.

70.     Commercial health insurers that offer health insurance within Jackson County and Williamson County and the surrounding geographic area consider Memorial Hospital of Carbondale a "must have" hospital because it is the largest hospital system in the region and the only provider of some essential services, such as neonatology, pediatrics, and sub-specialty cardiac surgery.

71.     Memorial Hospital of Carbondale also has an affiliation with Southern Illinois University's Medical School through its Family Practice Residency Program.

**b. Herrin Hospital**

72.     Herrin Hospital, located in Herrin, IL, is a 114-bed general acute-care hospital that has been in operation since 1913. It is owned by SIH and is also a not-for-profit facility.  Herrin Hospital offers a wide range of services including inpatient and outpatient surgical services, four surgical operating rooms, two endoscopy rooms, a laboratory, and a 24-hour emergency department. Herrin Hospital operates a chest pain center and is a feeder hospital for cardiovascular services to Memorial Hospital of Carbondale.

**c. St. Joseph Memorial Hospital**

25

73.     St. Joseph Memorial Hospital in Murphysboro is a 25-bed critical access hospital located in Murphysboro, Illinois. The facility is owned by SIH, which acquired it in 1995. It is a feeder hospital for services to Memorial Hospital of Carbondale. It is a not-for-profit facility, as well.

### d. Heartland Regional Medical Center

74.     Heartland Regional Medical Center ("Heartland") is a for-profit facility owned by Community Health Systems, Inc., a publicly traded company on the New York Stock Exchange (symbol-"CYH"). Heartland is a 92-bed facility located in Marion, Illinois.

### B. Outpatient Surgical Facilities

75.     Memorial Hospital of Carbondale, Herrin Hospital, St. Joseph Memorial Hospital and Heartland Regional Medical Center are four hospitals in Williamson and Jackson Counties that provide outpatient surgical services, albeit in a hospital setting. In addition to these hospital providers of outpatient surgical services, the following are freestanding providers of outpatient surgical services:

   a.  The Surgery Center of Southern Illinois f/k/a Marion Surgery Center, Ltd., located in Marion, Illinois, previously provided outpatient surgical services in a non-hospital setting focusing primarily on ophthalmology procedures and some pain remediation procedures. It has since closed for business;

   b.  Pain Care Surgery Center, located in Marion, Illinois, provides outpatient surgical services in a non-hospital setting and only performs pain remediation surgeries;

c. Physicians' Surgery Center, L.L.C., located in Carbondale, Illinois and majority-owned by SIH. It provides outpatient surgical services in a non-hospital setting;

d. Southern Illinois Orthopedic Center, LLC, a single specialty orthopedic outpatient surgical facility and partially owned by SIH, performs only orthopedic procedures; and

e. Plaintiff Marion HealthCare, L.L.C., a multi-specialty licensed surgery center located in Marion, Illinois.

76. Plaintiff Marion HealthCare is a multi-specialty freestanding outpatient surgery center offering outpatient surgical services to residents of Williamson and Jackson Counties and the local surrounding area. Plaintiff's surgery center was first developed in 2001, when it submitted an application to the Illinois Health Facilities Planning Board, Project #01-076, seeking a state permit to construct an outpatient surgical facility. Plaintiff offered Defendant SIH an opportunity to become an owner-investor in Project #01-076 but Defendant chose instead to oppose the project.

On January 15, 2002, Defendant SIH formally requested a public hearing from the Illinois Health Facilities Planning Board for the purpose of submitting testimony opposing Plaintiff's project #01-076. The public hearing was held on January 31, 2002. Defendant SIH formerly opposed Plaintiff's application, submitting both oral and written testimony at the hearing in opposition to the project.

The Illinois Health Facilities Planning Board issued Plaintiff a Certificate of Need permit to construct an outpatient ambulatory surgery center. The facility was constructed and thereafter received a state license from the Illinois Department of

Public Health. The facility subsequently opened for business, performing its first surgical case on April 9, 2004.

Southern Illinois Orthopedic Center, LLC and Physicians' Surgery Center, L.L.C., in both of which defendant SIH maintains an ownership interest, compete with Plaintiff's surgery center. Neither the Surgery Center of Southern Illinois nor the Pain Care Surgery Center competes directly and fully with Marion HealthCare because of their much narrower scope of service. The Surgery Center of Southern Illinois was primarily an ophthalmology facility, with very few other cases performed and has since closed for business. The Pain Care Surgery Center is a single-specialty facility licensed, staffed and equipped only to provide a very narrow scope of services related to the remediation of pain.

### C. Potential Expansion by Competitors

77.     Beginning in the fall of 2003, after receiving its Certificate of Need from the Illinois Health Facilities Planning Board n/k/a Illinois Health Facilities and Services Review Board, but prior to final licensure and commencement of operations, Marion HealthCare solicited agreements for participation as a network provider for various insurance companies including BlueCross and Health Alliance. Marion HealthCare completed an application for acceptance as a network provider with BlueCross. That application, however, was declined by BlueCross. On other dates between the fall of 2003 and October 2011, Marion HealthCare made renewed requests to join the BlueCross provider network but each time was declined by BlueCross. Repeated requests to join the Health Alliance network were also declined.

78.    It was eventually learned that SIH had included in its contract with BlueCross a provision prohibiting BlueCross from contracting with Plaintiff Marion HealthCare and other competitors.  On October 11, 2011, BlueCross representative Brenda Lane orally informed Marion HealthCare that BlueCross had an exclusive contract with SIH which prohibited BlueCross from contracting with Marion HealthCare, L.L.C. surgery center or other competing outpatient surgery centers.

On October 20, 2011, at 11:34 a.m., in an e-mail communication, BlueCross representative Brenda Lane informed Marion HealthCare that BlueCross was precluded from entering into an agreement with Marion HealthCare based on language in BlueCross' hospital agreement with SIH.   Marion HealthCare did not learn of the agreement until Oct. 20th, 2011.  As a result of this agreement, BlueCross is precluded from entering into a network provider agreement with Marion HealthCare and possibly other competitors for a substantial duration of time.

Through discovery herein, it has been learned that beginning at least as early as 2003, Defendant SIH entered into an exclusivity agreement with BlueCross wherein "Blue Cross agrees not to enter into a CPO (Community Participating Option) agreement ….with another hospital in the Southern Illinois counties of Jackson, Williamson, Franklin, Saline, Johnson, Union, Pulaski, Alexander, or Perry without the express written consent of the [Defendant]", thereby excluded all other hospitals in the region from having a CPO agreement with BlueCross.  (See attached **Exhibit I (Bates No. SIH 0073)**)

Beginning at least as early as 2005 and continuing through 2006, Defendant requested from BlueCross an exclusivity agreement that would prevent BlueCross

from contracting with Defendant's outpatient surgery competitors that Defendant perceived as, "steal[ing] the good margin business".  (See attached **Exhibit J (Bates No. 7848)).**

Then in 2006, through negotiations for a contract renewal for 2007, Defendant had demanded both exclusivity and a double digit increase in reimbursement rates. Lamenting the effect this demand would have on consumers, a BlueCross representative noted, "…you continue to ask for [**REDACTED BY DEFENDANT**] while ignoring my point about how [**REDACTED BY DEFENDANT**]  and will continue to be even given my reasonable proposal.  Not your problem I guess **just sock it to the consumers**." (emphasis added)  (See attached **Exhibit K (Bates No. 5815))**

79.  Through discovery herein, it was learned that SIH entered into an exclusivity agreement with Health Alliance dating back to 2003, before Marion HealthCare was yet operational.  Additional exclusivity agreements were identified between SIH and BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West.   On information and belief, SIH may have additional exclusionary contracts in place with other commercial insurers prohibiting contracts with Marion HealthCare.

80.  Marion HealthCare has additional capacity to provide services to the Illinois residents of Williamson and Jackson Counties and local surrounding geographic regions, which it could use but for the exclusive contracts in place between SIH and BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West and possibly other insurance plans.  On multiple occasions since its opening in 2004, Marion HealthCare, L.L.C has attempted to obtain in-network status with BlueCross

and Health Alliance without success. BlueCross has refused to contract with Marion HealthCare, L.L.C. for in-network status, citing its exclusive contract with SIH as prohibiting a contract for in-network status with any competing surgery centers. Health Alliance has also consistently refused.

## V. SIH'S MONOPOLY POWER

81.     SIH has monopoly power in the two sets of relevant product markets in the Williamson and Jackson Counties and adjacent local area for (a) the sale of inpatient hospital services and (b) the sale of outpatient surgical services – first, in the relevant product markets (a and b) for the sale of such services to all payors, and second, in the relevant product markets (a and b) for the sale of such services only to commercial insurers. SIH has dominated both sets of product markets in the Williamson and Jackson Counties and adjacent local area and its prices have climbed. Additionally, over the past several years, SIH has embarked on a plan to acquire and otherwise control independent healthcare providers in the region and thereby increase its control over the referral of patients in the market. SIH continues to attempt to strengthen its monopoly by purchasing independent physician practices, including surgeons, primary care physicians, nurse practitioners and physician assistants, further establishing its monopoly power in the geographic market.

82.     SIH is by far the largest provider of inpatient hospital services in the Williamson and Jackson Counties and adjacent local area. Per verified hospital data from the Illinois Department of Public Health CY 2010, SIH's market share of inpatient hospital services in the Williamson and Jackson Counties and adjacent local area is estimated as follows:

a.  SIH has a 77% market share of the total hospital inpatients covered by commercial insurance;

b.  SIH has a 72.3% market share of the total hospital inpatients covered by all payors.

c.  SIH has 80.6% market share of Inpatient Revenue received from patients covered by commercial insurance. Total net inpatient revenue from commercial payors in the region was $76,576,268 and SIH net inpatient revenue was $61,700,692;

d.  Collectively, considering total inpatients and total outpatients served who were covered by private commercial insurance, SIH had a market share of 85% for all patients covered with such insurance;

e.  Considering total inpatients and total outpatients served who were covered by any payor, SIH had a market share of 80.9% for all patients

f.  SIH had a 72.3% market share of admissions and 75% market share of total inpatient days;

g.  SIH had a 68.6% market share of total births; and

h.  SIH had a 77% market share of inpatient surgical cases.

83.    SIH is also by far the largest provider of outpatient services in the Williamson and Jackson Counties and adjacent local area. Per certified data from the Illinois Department of Public Health CY 2010, SIH's market share of outpatient hospital surgical services includes:

a. SIH has a 76% market share of the outpatient surgical cases at hospitals in the Williamson and Jackson Counties and adjacent local area, performing 5,428 outpatient surgical cases of the 7,127 total outpatient surgical cases;

b. SIH has a 96% market share of outpatient procedure room utilization for gastrointestinal (GI) procedures, performing 6,089 GI procedures out of the 6,344 GI procedures performed in hospital procedure rooms in the Williamson and Jackson Counties and adjacent local area;

c. SIH has an 85.3% market share of the total outpatients served with commercial insurance, serving 99,168 patients of the total 116,230 patients covered with commercial insurance;

d. SIH has 82.1% of the market share of outpatient revenue received from Commercial Private Insurance payors, receiving $131,164,280 of the total $159,774,668;

e. SIH has 77.2% of the market share of outpatient revenue received from all payors, receiving more than $203,200,000 of the total of approximately $263,100,00; and

f. SIH has 81.5% of the market share of total outpatient visits by hospital providers in Williamson and Jackson Counties, Illinois, with 260,191 outpatients visits out of the 319,156 total outpatient visits.

84. Given the ownership interests of SIH in hospitals (Memorial of Carbondale, Herrin and St. Joseph) and freestanding outpatient surgery providers (Southern Illinois Orthopedic Center and Physicians' Surgery Center), SIH is by far the dominant provider of, and possesses a monopoly in, 'day-surgery' services, i.e.,

outpatient hospital or freestanding facility surgical services, in the relevant geographic market. Accordingly, SIH's share of overall outpatient surgical services performed at a SIH hospital or surgery facility owned in whole or part by SIH is in all likelihood greater than the 76% market share figure in Paragraph 45(a) above (i.e., SIH's share of hospital outpatient surgical cases in the relevant geographic market).

85. SIH, through its wholly owned subsidiary Southern Illinois Medical Services (SIMS), recently acquired the practices of 30+ healthcare providers when it purchased Carbondale Clinic in Carbondale, Illinois. It acquired the practices of 20 healthcare providers when it purchased Logan Primary Clinic November 1, 2011, and on information and belief it exclusively leases the services of Prairie Cardiovascular cardiology for cardiology services in the market. On information and belief, SIMS has 128 providers in 18 different specialties holding a strongly dominant position in the medical services market, including referrals for outpatient surgery. On information and belief, SIMS contracts with and/or employs healthcare providers, paying them far above fair market value for their services, incurring millions of dollars of losses annually, and subsidizing its losses by using its not-for-profit tax exempt status, with the purpose of monopolizing the healthcare market, including the outpatient surgery market.

## VI. SIH HAS WILLFULLY MAINTAINED AND EXTENDED ITS MONOPOLY POWER THROUGH THE USE OF ANTICOMPETITIVE EXCLUSIONARY CONTRACTS

### A. The Exclusionary Contracts and Their Terms

86. As sellers and/or administrators of commercial health insurance coverage in the market, BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-

West and others had and have a compelling business need to include SIH within their
networks of inpatient service providers and desired to do so at discounted rates. On
information and belief, in consideration of the discounts sought by BlueCross, Health
Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West on inpatient services, SIH
demanded exclusionary language in its contracts with certain commercial insurance
companies, including BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth,
and Great-West prohibiting them from contracting with competing non-SIH
ambulatory surgery centers, including Plaintiff Marion HealthCare.

87.     Generally, commercial insurers prefer and the general public benefits from an
open network of potential healthcare providers, in which patients have a choice of
hospitals and outpatient surgical facilities. Notwithstanding their preference to
maintain an open network, when insurers are faced with a hospital provider who
holds a monopoly in certain healthcare services, insurers may have no choice but to
acquiesce to exclusivity demands. In return, insurers may be granted discounts for
inpatient hospital service rates from "must have" hospitals like SIH which hold
monopoly power in certain healthcare markets.

88.     As previously alleged, plaintiff Marion learned of SIH's exclusive dealing
arrangement with BlueCross in October 2011. SIH granted BlueCross discounts on
inpatient hospital services on condition that BlueCross refuse to provide in-network
coverage of outpatient surgical services performed by Plaintiff and other competitors
of SIH's outpatient surgical services.

89.     Through discovery herein, Plaintiff has learned that SIH had entered into
substantially similar exclusive dealing arrangement with Health Alliance, GHP,

PHCS, HFN, SelectHealth, and Great-West, some specifically naming Plaintiff as an excluded entity and dating back to before Plaintiff was open for business.

90.     SIH has improperly and illegally coerced BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West and perhaps others  into entering into agreements that tied discounts for coverage of SIH's inpatient hospital services with exclusive contracting for in-network coverage of SIH's outpatient surgical services, thereby prohibiting the insurance companies from contracting for in-network coverage with competing freestanding outpatient surgery centers in the region.  These arrangements constitute both exclusive dealing and tying.

91.     SIH's improper conduct coerces commercial insurers such as BlueCross and Health Alliance to exclude competing outpatient surgery centers from entering the healthcare market to compete with SIH for outpatient surgical services.

92.     As stated herein, for the insurance companies, SIH is a must-have hospital for their plan provider networks.   This is because SIH is the only provider of certain services in the relevant market and because its sheer size and market share compel the companies to contract with SIH for inpatient services.  Under the terms of its exclusivity agreement, if BlueCross desires to contract with Marion for outpatient services, it can only do so with the permission of Marion's competitor, SIH.  If SIH refuses such consent, as it repeatedly did, BlueCross has no ability to force SIH to waive consent and no practice ability to terminate.

93.     SIH imposed the exclusive dealing and tying provisions in direct response to the competitive threat presented by Marion HealthCare's surgery center to SIH's monopoly position in the outpatient surgical market.

36

94.     SIH imposed these exclusionary dealings provisions in order to maintain and extend its monopoly in the outpatient surgical market and there is no valid business purpose for the exclusionary contracts, except to prohibit competition.

95.     SIH has used its 501(c) (3) not-for-profit status and its exemption from federal income taxes, including revenues garnered from state and federally subsidized healthcare programs to reduce, restrict and attempt to eliminate competing healthcare businesses, to the detriment of the public.

### B. SIH's Exclusionary Contracts Foreclose its Rivals from Commercial Health-Insurance Contracts.

96.     Inclusion in health insurer networks is critical because patients generally seek health-care services from "in-network" providers and thereby incur substantially lower out-of-pocket costs than if the patients use out-of-network providers. Patients generally seek in-network services because, typically, a health insurer charges a member substantially lower co-payments or other charges when the member uses an in-network provider.

97.     By reason of SIH's monopoly power in the markets for inpatient hospital services and outpatient surgical services, and the individual and combined market power of BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West as providers of commercial coverage of such services in the relevant geographic market, SIH has, through its exclusionary arrangements, substantially foreclosed Marion HealthCare and, on information and belief, other competitors from commercial health-insurance contracts for outpatient surgical services in Williamson and Jackson Counties and the surrounding area, and such contracts are crucial for its rivals to effectively compete.

98.     By effectively denying its competitors critical in-network status, SIH and
BlueCross have substantially reduced the number of patients who would otherwise
use Marion HealthCare and other competitors for outpatient surgical services. More
importantly, SIH's exclusive contracts effectively deny access to non-SIH affiliated
providers to a substantial percentage of patients with commercial health insurance,
corresponding to the combined market share of the carriers for commercial health
insurance coverage in the relevant geographic market with which SIH has an
exclusive arrangement.

99.     The foreclosure is magnified by the common efficient industry-standard
scheduling practices of the independent physicians who make up the medical staff of
Marion HealthCare.  The physicians are required by state regulation to maintain
surgical privileges at a local hospital.  The physicians routinely schedule multiple
outpatient surgical procedures in succession so as to efficiently utilize their time and
to reduce overall costs associated with providing the service.  For example, a
physician may perform ten colonoscopy procedures on ten different patients in
succession. If, hypothetically, one of those ten procedures is to be reimbursed by an
exclusive insurance company such as BlueCross and the other nine are reimbursed by
any combination of non-exclusive commercial and government payors, the physician
must perform all ten cases at a facility where the BlueCross case will be reimbursed
in order to perform all ten cases in succession. Thus, in this common hypothetical
scenario, Marion HealthCare would be foreclosed not only from the one BlueCross
case, but from the other nine cases as well.

100.    As described above, it is substantially more profitable for hospitals to serve
        patients with commercial health insurance than Medicare, Medicaid, or TRICARE
        patients, because government plans pay significantly less than commercial health
        insurers. This is true generally and in Williamson and Jackson Counties and the
        surrounding area. Virtually all commercial health plans in this area pay SIH
        substantially more than the Medicare, Medicaid and TRICARE payment rates.

101.    Consequently, patients covered by government plans are not adequate substitutes
        for commercially insured patients. In fact, SIH, like many other hospitals, depends on
        payments from commercial health insurers to compensate for the comparatively low
        payments it receives from government payors.  Because government payors are
        insignificant sources of revenue for outpatient surgical services, these payments
        provide little or no contribution margin to offset SIH's overhead expenses.

102.    Payments from BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth,
        and Great-West to SIH as a result of its exclusionary contracts accounted for a
        substantial portion of all payments that SIH received from commercial health
        insurers.

103.    Because the insurers, including BlueCross, Health Alliance, GHP, PHCS, HFN,
        SelectHealth, and Great-West, that have exclusionary contracts with SIH pay rates
        much higher than governmental programs such as Medicare and Medicaid, these
        insurers account for a substantial share of the profits that would otherwise be
        available to competing health-care providers.

104.    If the commercial health insurers that have exclusionary contracts with SIH
        added Marion HealthCare to their networks, the resulting greater profit that Marion

HealthCare would earn would provide the basis for increased competition, increased services, greater innovation and greater choice for patients, whereas the foreclosure caused by the exclusionary contracts is resulting in the effective denial of these fruits of competition to healthcare consumers.

105.    The foreclosure is further magnified by the fact that many Medicare beneficiaries carry a secondary supplemental insurance policy from BlueCross or Health Alliance that covers certain Medicare patient-responsible copays, deductibles and non-covered charges left over after Medicare makes its primary reimbursement.  Thus many cases for which Medicare is the primary payor are still foreclosed to Marion HealthCare because of the exclusivity agreements that prevent Marion from being a network provider for BlueCross and Health Alliance.

### C. SIH's Exclusionary Contracts Likely Have Caused Substantial Anticompetitive Effects.

106.    SIH's exclusionary contracts have reduced competition and enabled SIH to maintain its monopoly power in the provision of inpatient hospital services and outpatient surgical services. By effectively preventing BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West from including in its network other outpatient facilities, such as Marion HealthCare, SIH has:

    a.    delayed and prevented the expansion and entry of SIH's competitors, likely leading to higher healthcare costs and higher health insurance premiums;

    b.    limited price competition for price-sensitive patients, likely leading to higher healthcare costs for those patients;

    c.    reduced quality competition between SIH and its competitors;

    d.   reduced the likelihood that patients will be treated at Marion HealthCare and other excluded outpatient surgery centers; and

    e.   reduced the healthcare options for patients in need of outpatient surgery.

107.    In a September 24, 2010 email communication from BlueCross to Defendant, is was noted, "[BlueCross has] reviewed the comparison data that [SIH] provided. It is important to point out that the comparison you provided and your proposal do not seem to take into account that the current agreements for the SIH hospitals are exclusive arrangements whereas the agreements with other hospitals are not exclusive arrangements. One would expect that the rates under an exclusive arrangement should be less than a non-exclusive arrangement. In the other markets, a significant portion of outpatient services may be performed at lower cost outpatient freestanding surgery centers, laboratory and radiology centers." (See attached **Exhibit L (Bates No. 7239-7240)**)

108.    Similarly, in a November 3, 2010 letter from BlueCross to SIH, it was acknowledged that the exclusivity clause had not resulted in a procompetitive effect (lower prices); "The SIH hospital rates, especially outpatient, are already very high and there is an exclusive arrangement that other hospitals do not have" (See attached **Exhibit M (Bates No. SIH 4372)**)

### a. The exclusionary contracts have likely delayed and prevented expansion and entry.

109.    The exclusionary contracts have likely delayed and prevented competitors from expanding in or entering the relevant markets, leading to higher healthcare costs and higher health-insurance premiums. As alleged above, SIH's exclusionary contracts

effectively prevent large commercial health insurers such as BlueCross and Health Alliance from contracting with competitors of SIH's outpatient surgery facilities. If SIH had not imposed its exclusionary contracts, BlueCross and Health Alliance likely would have contracted with Marion HealthCare surgery center (and with other competing providers or providers that otherwise might have entered the market), giving the competitors in-network access to the patients covered by commercial health insurers.

110.    Furthermore, physicians treating patients covered by commercial health insurers that have been effectively prevented from contracting with SIH's competitors would likely have referred more patients to these competitors, and more patients would likely have chosen to use them. In addition to referrals of patients insured by commercial health insurers with exclusionary contracts, such referrals would have likely included additional referrals of BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West  patients and patients covered by Medicare, Medicaid, and TRICARE. Many doctors engage in "block-scheduling," finding it most efficient to perform all of a given day's surgeries and other procedures at the same facility. This, in turn, would have given SIH's competitors higher patient volumes and utilization and increased revenues.

111.    The higher volumes and profits obtained from serving additional patients insured by commercial health insurers, i.e., the patients that are the most profitable to healthcare providers, as well as additional Medicare, Medicaid or TRICARE patients, likely would have allowed Marion HealthCare and other competitors to expand. This

expansion of output would enable the competitors to compete more effectively with SIH, likely resulting in more competition and lower health-care costs.

112.    Plaintiff Marion HealthCare surgery center has considered expansion into additional services on numerous occasions, including breast cancer screening and diagnostic services, but has been limited in its ability to expand due to its lack of in-network access to commercially insured patients covered by BlueCross and Health Alliance insurance. Marion HealthCare also would likely fill its significant excess capacity for the services it already provides – an excess capacity largely resulting directly from the defendant's exclusionary conduct – if it had access to the commercial health insurers that currently have exclusionary contracts with SIH.

113.    BlueCross has actively attempted to thwart Marion HealthCare's expansion in the market place by sending threatening letters via certified mail to local physicians, threatening those physicians that their individual BlueCross provider contracts will be terminated if they continue to utilize out-of-network Marion HealthCare.  Whether of its own volition or through prompting by SIH, BlueCross has done this in order to enforce the exclusivity provision on its own insureds, notwithstanding their PPO rights to choice of provider (albeit with significant financial penalty).

114.    The lack of in-network access to commercially insured patients has also detrimentally affected Marion HealthCare because commercial insurers routinely inform patients in need of outpatient surgical services that they must use an in-network provider or face substantially higher out-of-pocket fees, co-pays and deductibles. Additionally, large insurance companies routinely send letters and communications to physicians threatening them that they risk being excluded from

the insurance company's in-network status if they do not utilize in-network outpatient surgical facilities.

115.    SIH's exclusionary contracts also inhibit new providers from entering the market. Potential entrants are dissuaded from entering the market because they cannot obtain contracts with commercial health insurers, such as BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West which have customers in that market and which are limited by SIH's exclusionary contracts for in-network coverage of outpatient surgical services.

116.    Defendant, itself, acknowledged the market barrier intent of the exclusivity agreement in a December 19, 2006 internal email communication, stating, "…this is to prevent the docs that want to build a new surgical center from being able to contract with Blue Cross."  (See attached **Exhibit N (Bates No. 7855)**)   Similarly, in 2011, in an internal communication to the SIH Board, CEO Rex Budde wrote, "As you may be aware, we have had several conversations with Marion HealthCare about purchasing a portion of that organization.  *** Long story short, for years we have had an exclusive contract with Blue Cross for outpatient services that barred any new comers to the market from participating in the contract. *** During one of the last conversations we had with Marion HealthCare they asked us to waive the contract restriction and we declined.  Once would not concede on such a point if there was any hope of negotiating a contract with them. ***"  (See attached **Exhibit O (Bates No. SIH 6042)**)

117.    By limiting the expansion or entry of competitors, SIH's exclusionary contracts have helped it to maintain and extend its monopoly in the markets for outpatient

surgical services – whether defined as services reimbursed by all payors or only as reimbursed by commercial insurance – and likely increased the cost of providing medical care to residents in Williamson and Jackson Counties and the surrounding area.  Because the exclusionary contracts have likely limited competitors' expansion and entry in the relevant market, and thereby reduced insurers' bargaining leverage with SIH, the contracts likely have enabled SIH to continue to demand higher prices from commercial health insurers for outpatient surgical services, free from competitive discipline.

118.    Medical care expenses are typically 80% or more of an insurer's costs, and hospital inpatient expenses are a substantial portion of medical care costs. The price of hospital inpatient services at individual hospitals directly affects health insurance premiums for the customers that use those hospitals. Accordingly, insurers' hospital costs are an important element of insurers' ability to offer competitive prices.

119.    On information and belief, SIH's outpatient surgery costs are substantially higher than similar services provided by comparable non-SIH outpatient surgical facilities. The higher payment rates demanded by SIH from commercial health insurers are borne in part by local area employers and residents in the form of higher insurance premiums.

**b.  The exclusionary contracts likely have limited price competition for price-sensitive patients.**

120.    The exclusive contracts between SIH and the Insurance Companies including BlueCross and Health Alliance have likely reduced competition for price-sensitive patients in the relevant markets. Certain patients select a hospital or outpatient

45

surgery center based on price because the prices charged can affect the patient's out-of-pocket costs. Exclusionary contracts effectively prevent insurers from including providers such as Marion HealthCare in commercial health insurers' networks. This makes it less likely that a commercially insured patient would switch to Marion HealthCare in response to a price increase by SIH, and hence reduce this constraint on SIH's prices. Consequently, the exclusionary contracts enable SIH to charge higher prices for many services.

121.    Depending upon the specific procedure being performed, facility fees for outpatient surgery performed at Defendant SIH hospitals are on average substantially higher than for a similar procedure performed at Marion HealthCare.  For example, on information and belief, outpatient surgical facility fees at Memorial Hospital in Carbondale ("Memorial") for laparoscopic gall bladder surgery range from $19,906.00 to $34,314.00.  Facility fees for a colonoscopy at Memorial vary between $4,559.00 and $21,705.00. These are substantially higher than similar fees at Marion HealthCare, L.L.C.

122.    State of Illinois, Department of Public Health Charge data ("Charge Data") through September 2011 indicate that Memorial charges over $6,000 more per procedure for a breast lumpectomy, traditionally performed for localized breast cancer, than at Marion Healthcare.  State data reveal Memorial's charges average $13,003 for the procedure while Plaintiff's average charges are $6,984. Similar Charge Data for pediatric tonsillectomy reveal average charges of $10,152 at Memorial, $12,959 at SIH's Herrin Hospital, and $4,731 at Plaintiff's facility – less than half the price at Memorial or Herrin.. Average Bunionectomy charges at

Memorial are more than $10,000 above those at Marion HealthCare's facility.
Memorial's charges for pediatric myringotomy (ear) tube insertion are 25% higher
than similar service charges at Marion HealthCare ($7,773 vs. $5,723).

123.     The exclusionary contracts have likely caused some patients to defer, postpone or
entirely forgo recommended procedures, such as colon cancer screening, as a result of
the higher prices from the exclusive contract language. It is likely some patients have
chosen to forgo colon cancer screening or other procedures rather than pay the higher
charges associated with undergoing the procedure at an SIH hospital.

124.     Patients covered by, for example, BlueCross or Health Alliance insurance who
choose to proceed with cancer screenings are forced to incur greater charges and
expenses at in-network hospitals as compared to having the procedures performed at
Marion HealthCare.  A case in point is Michael D. Phillips, a resident of Marion,
Williamson County, Illinois.  Mr. Phillips has consented to have his health
information publicly included in this Complaint.  He is an employee of the city of
Marion and covered by BlueCross insurance. He was advised of the need to undergo
a cancer screening colonoscopy and esophagogastroduodenoscopy (EGD) in 2011.
He inquired about the possibility of undergoing the procedure at Marion HealthCare
but was informed by BlueCross that since the facility was out-of-network it would
cost him more money out-of-pocket to have it done at an out-of-network facility.
Whether Mr. Phillips would have actually incurred more out-of-pocket expense is
uncertain, but due to these representations, on July 12, 2011 Mr. Phillips had the
procedures performed at an in-network hospital facility. The facility charges for the
colonoscopy and EGD procedures were $12,222.92 and Mr. Phillips' out-of-pocket

portion of the bill was $3,491.17.  By contrast, Marion HealthCare's facility charges for the exact same procedures would have been $6,511.39, or about 47% less than the in-network facility amount ($12,222.92) Mr. Phillips was charged.  If BlueCross had been free to contract with Marion HealthCare as a network provider of outpatient service, Mr. Phillips would have been permitted to obtain in-network service from his provider of choice and without suffering a severe substantial financial penalty in the percentage of the charge for which he was personally responsible out-of-pocket. Assuming that BlueCross would have allowed the same reimbursement for like services provided by Marion HealthCare as it allowed for the like service provided at the in-network hospital, Mr. Phillips would have paid substantially less out-of-pocket for the exact same service.  Instead, because of the exclusivity provision in BlueCross' contract with SIH, Marion HealthCare was not permitted to be in-network. Mr. Phillips was denied his choice of provider and was forced to pay substantially more for the procedures.

### c.  The exclusionary contracts likely have reduced quality competition between SIH and its competitors.

125.     Patients and physicians often choose among hospitals and other health-care providers based on the provider's quality and reputation, including quality of care (reflected in past performance on clinical measures such as morbidity and mortality rates) and quality of service (reflected in non-clinical characteristics that may appeal to patients, including amenities such as physical surroundings, staff hospitality and other services). Because there is a financial penalty for using out-of-network providers, patients with health insurance provided by insurers with exclusionary

contracts are less likely to choose out-of-network providers, even if the patient believes the out-of-network provider offers superior quality to SIH.

126.     If SIH's competitors became in-network providers for more commercially insured patients, each of those competitors would have the incentive to make additional improvements in quality to attract those patients to its facility. SIH, in turn, would also have the incentive to improve its quality in order to keep patients from choosing Marion HealthCare or another competitor. Therefore, without the exclusionary contracts, SIH and its competitors would have increased incentives to make additional quality improvements, and the overall level of quality of health care in Williamson County and Jackson County and surrounding areas likely would be higher. Moreover, such quality improvements would benefit all patients, not just those with commercial health insurance.

127.     In an effort to enforce the exclusivity provision on its own insureds, notwithstanding their PPO rights to choice of provider (albeit with significant financial penalty), BlueCross, either of its own volition or through prompting by SIH, has actively attempted to steer physicians and patients away from Marion HealthCare by sending local physicians threatening written communications via certified mail and threatening those physicians that their BlueCross provider contract will be terminated if they continue to utilize Marion HealthCare surgery center.  These letters have been sent notwithstanding the high quality care provided by Marion HealthCare.

### D. The Exclusionary Contracts Have Likely Driven Up the Cost of Outpatient Surgical Services for the Community.

128.    By decreasing the available outpatient surgical options for the community, the exclusionary contracts have decreased competition in the geographic market.

129.    This decrease in competition has allowed SIH to charge patients in the community higher prices for outpatient surgical services than if there was unfettered competition.

130.    Because Marion HealthCare surgery center is an out-of-network provider with respect to BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West, even if a patient covered by one of these companies desires to have surgery at Marion HealthCare, the patient would be responsible for more out-of-pocket if the patient has surgery at the facility.

131.    As a result of the exclusivity agreement and their payment practices, BlueCross and Health Alliance improperly discriminate on price against Marion HealthCare by arbitrarily decreasing the "allowable" amounts paid for surgical services if and when a patient chooses an out-of-network facility.  For instance, if a patient has surgery at an in-network facility, BlueCross and Health Alliance each have set established "allowable" facility fees for which it reimburses the in-network facility. In contrast, if a patient receives surgery at an out-of-network facility, BlueCross and Health Alliance improperly decrease the "allowable" amount for the facility fee for the same service, merely because the facility is out-of-network, and regardless of the facility's actual billed charges. As a hypothetical, assume Facility A is an out-of-network facility and its usual and customary charge for widget surgery is three thousand dollars ($3,000.00).  Assume Facility B is an in-network facility. If a patient has a hypothetical widget surgery at in-network Facility B, the "allowable charges" might

be two thousand dollars ($2,000.00). But if the patient goes to out-of-network
Facility A, and has the exact same widget surgery, BlueCross arbitrarily reduces the
"allowed charges" drastically, sometimes below one-quarter of the in-network fee
(e.g., $500.00). The patient is faced with either paying the difference between the
arbitrarily lowered "allowed charge" of $500.00 and the actual usual and customary
fee ($3,000.00) or forgoing access to out-of-network providers. In addition, the
patient often has a much larger co-pay and deductible. This practice has a tremendous
influence in steering patients exclusively to facilities which have "in-network" status
with BlueCross or Health Alliance, even though BlueCross and Health Alliance have
led patients to believe they are selling policies with out-of-network benefits.

### E. The Exclusionary Contracts Lack a Valid Procompetitive Business Justification.

132.      In this case, there is no valid procompetitive business justification for SIH's
exclusionary contracts. SIH did not use the contracts to achieve any economies of
scale or other efficiencies as a result of any additional patient volume that it obtained
from the contracts.

### COUNT I
### EXCLUSIVE DEALING ARRANGEMENT
### SHERMAN ACT, SECTION 1 (15 U.S.C. § 1)

133.      Marion HealthCare incorporates its allegations in paragraphs 1-132 against SIH
as if fully stated herein.

134.      SIH entered into contracts with BlueCross, Health Alliance, GHP, PHCS, HFN,
SelectHealth, and Great-West and perhaps others agreeing to provide healthcare
services to patients covered by those companies at discounted rates on the condition

that those companies would purchase outpatient surgical services (with related goods) exclusively from SIH and would not contract for in-network status with Marion HealthCare, a competing surgery center, or any additional surgery centers which provided similar outpatient surgical services to patients in the Williamson and Jackson Counties and adjacent local area.

135.    The effect of the contract between SIH and BlueCross has been to substantially lessen competition for SIH in the health care outpatient surgical services market, whether defined as services reimbursed by all payors or services reimbursed only by commercial insurers, by substantially foreclosing in-network insurance coverage options for patients and, as a result, foreclosing their options for in-network outpatient surgical services.

136.    SIH has market power in the relevant markets for the provision of outpatient surgical services, whether reimbursed by all payors or reimbursed only by commercial insurers, in the relevant geographic market.

137.    SIH's exclusive dealing contracts with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West  have materially and substantially harmed competition and injured consumer welfare by, among other things:

    a.  Decreasing the number of options available to patients seeking or in need of outpatient surgical services;

    b.  Decreasing the quality of care to patients seeking or in need of outpatient surgical services;

    c.  Substantially raising entry barriers in the outpatient surgical services market;

    d.   Suppressing price competition, thereby increasing the price patients must pay in the geographic market for outpatient surgical services;

    e.   Increasing the price patients and their employers must pay for commercial health insurance;

    f.   Raising the barriers to entry and decreasing the potential for entry by new competing entrants into the commercial health insurance market;

    g.   Decreasing the potential for entry by new competing  surgery centers into the outpatient surgical market;

    h.   Substantially foreclosing access of Marion HealthCare and like competitors to patients paying commercially reimbursed fees for services, where patients paying only government-reimbursed (Medicare, Medicaid, TRICARE) fees provide relatively insignificant sources of financial input and are not meaningful substitutes in revenue terms, such that they could fill the shortfall in patient revenue resulting from defendants' conduct and enable Marion and like competitors to remain viable and competitive with SIH, thereby causing harm to competition and consumer welfare; and

    i.   Enabling SIH to maintain a monopoly in the provision of outpatient surgical services.

138.    SIH's exclusive dealing contracts with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West have materially and substantially injured Plaintiff Marion HealthCare surgery center by, among other things;

    a.   Substantially decreasing the surgery center business volume and revenue;

    b.   Substantially decreasing the business value of the company;

    c.   Decreasing the profitability of the business; and

    d.   Foreclosing or greatly decreasing access to potential patients (customers) in need of outpatient surgical services; and increasing Plaintiff's per-patient replacement costs, that is, increasing the number of patients not insured by BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West that Plaintiff will need to try to replace, to compensate for the elimination of the excluded patients from the pool of available potential patients.

**COUNT II**
**EXCLUSIVE DEALING ARRANGEMENT**
**ILLINOIS ANTITRUST ACT**

139.    Marion HealthCare incorporates its allegations in paragraphs 1-132 against SIH as if fully stated herein.

140.    SIH entered into contracts with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West agreeing to provide health care services (with related goods) to patients covered by those companies at discounted rates on the condition that those companies would exclusively purchase outpatient surgical services (with related goods) from SIH and would not contract for in-network status with Marion HealthCare L.L.C., a competing surgery center which provided similar outpatient surgical services to patients in the Williamson and Jackson Counties and adjacent local area.

141.    Under the Illinois Antitrust Act, "Every person [SIH] shall be deemed to have committed a violation of this Act who shall:...(4) ...make a...contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, or services... on the condition,...that the purchaser [BlueCross, Health Alliance, etc] thereof shall

54

not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodity or service...of a competitor [Marion Healthcare LLC] or competitors of the...seller [SIH], where the effect of such contract for such sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce."

142. The effect of the contracts between SIH and the excluded companies has been to substantially lessen competition in the health care outpatient surgical services market, whether defined as services reimbursed by all payors or services reimbursed only by commercial insurers, by substantially foreclosing in-network insurance coverage options for patients and, as a result, foreclosing their options for in-network outpatient surgical services.

143. SIH has market power in the relevant markets for the provision of outpatient surgical services, whether reimbursed by all payors or reimbursed only by commercial insurers, in the relevant geographic market.

144. The exclusive dealing contracts with SIH have materially and substantially harmed competition and injured consumer welfare by, among other things:

    a. Decreasing the number of options available to patients seeking or in need of outpatient surgical services;

    b. Decreasing the quality of care to patients seeking or in need of outpatient surgical services;

    c. Substantially raising entry barriers in the outpatient surgical services market;

    d. Suppressing price competition, thereby increasing the price patients must pay in the geographic market for outpatient surgical services;

e. Increasing the price patients and their employers must pay for commercial health insurance;

f. Raising the barriers to entry and decreasing the potential for entry by new competing entrants into the commercial health insurance market;

g. Decreasing the potential for entry by new competing surgery centers into the outpatient surgical services market;

h. Substantially foreclosing access of Marion HealthCare and like competitors to patients paying commercially reimbursed fees for services, where patients paying only government-reimbursed (Medicare, Medicaid, TRICARE) fees provide relatively insignificant sources of financial input and are not meaningful substitutes in revenue terms, such that they could fill the shortfall in patient revenue resulting from defendants' conduct and enable Marion and like competitors to remain viable and competitive with SIH, thereby causing harm to competition and consumer welfare; and

i. Enabling SIH to maintain and extend its monopoly in the provision of outpatient surgical services;

145. The exclusive dealing contracts with SIH have materially and substantially injured Plaintiff Marion HealthCare surgery center by, among other things:

a. Substantially decreasing the surgery center business volume and revenue;

b. Substantially decreasing the business value of the company;

c. Decreasing the profitability of the business; and

d. Foreclosing or greatly decreasing access to potential patients (customers) in need of outpatient surgical services; and increasing Plaintiff's per-patient

56

replacement costs, that is, increasing the number of patients not insured by the excluded carriers that Plaintiff will need to try to replace, to compensate for the elimination of excluded carrier-covered patients from the pool of available potential patients.

## COUNT III
## TYING ARRANGEMENTS
## SHERMAN ACT, SECTION 1 (15 U.S.C. § 1)

146.   Marion HealthCare incorporates its allegations in paragraphs 1-132 against SIH as if fully stated herein.

147.   SIH has improperly and illegally coerced BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West and perhaps others into entering into agreements that tied discounts for coverage of SIH's inpatient hospital services, including related goods, such as drugs and implants, with exclusive contracting for in-network coverage of SIH's outpatient surgical services, including related goods, such as drugs and implants, thereby prohibiting coerced BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West and perhaps others from contracting for in-network coverage with competing freestanding outpatient surgery centers in the region.  This conduct constitutes a per se illegal tie by SIH.  In the alternative, this conduct is unlawful under the rule of reason.

148.   SIH has monopoly power in the markets for inpatient hospital services and outpatient surgical services, whether defined as reimbursed by any payors or only by commercial insurers, in the relevant geographic market.

149.   SIH used its monopoly power in the market for inpatient hospital services to coerce coerced BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and

Great-West and perhaps others to agree not to provide in-network insurance coverage
of outpatient surgical services provided by Marion HealthCare surgery center. SIH
did this by granting coerced BlueCross, Health Alliance, GHP, PHCS, HFN,
SelectHealth, and Great-West and perhaps others access to discounted rates from SIH
for general inpatient hospital services in return for the insurance companies'
agreements to exclude Marion Healthcare in this manner.

150.    SIH's more than 75% share of the market for acute care services in the relevant
geographic market has given it the ability to coerce the insurance companies
economically to agree not to provide in-network insurance coverage of outpatient
surgical services provided by Marion HealthCare surgery center, and SIH exercised
that market power.

151.    This tie affected a significant volume of business in the outpatient surgical
services market and has had an anticompetitive effect in the market for outpatient
ambulatory surgery services in Williamson and Jackson Counties and the surrounding
area.

152.    BlueCross recently contracted with the state of Illinois to become a dominant
provider of health insurance for state employees in the region, including employees
employed by Southern Illinois University, state employees, dependents and retired
state workers. Because BlueCross is a major supplier of commercial health insurance
in the region, and is a major private seller of group and individuals healthcare
insurance, exclusion from the BlueCross network has the ability to affect a large
segment of the healthcare market. That effect is substantially compounded by the
exclusion from Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West.

153.    In a competitive market, BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West would not have been subject to coercion from a "must have" inpatient hospital service provider, and would instead have each been free to contract with competing providers of outpatient services so as to reap the benefits of lower prices, greater access, and higher quality for its insureds needing outpatient surgical services in the market.

154.    The tying arrangements with SIH have materially and substantially harmed competition and injured consumer welfare by, among other things:

a.   Decreasing the number of options available to patients seeking or in need of outpatient surgical services;

b.   Decreasing the quality of care to patients seeking or in need of outpatient surgical services;

c.   Substantially raising entry barriers in outpatient surgical services market;

d.   Suppressing price competition, thereby increasing the price patients must pay in the geographic market for outpatient surgical services;

e.   Increasing the price patients and their employers must pay for commercial health insurance;

f.   Raising the barriers to entry and decreasing the potential for entry by new competing entrants into the commercial health insurance market;

g.   Decreasing the potential for entry by new competing surgery centers into the outpatient surgical market;

h.   Substantially foreclosing access of Marion HealthCare and like competitors to patients paying commercially reimbursed fees for services, where patients

paying only government-reimbursed (Medicare, Medicaid, TRICARE) fees provide relatively insignificant sources of financial input and are not meaningful substitutes in revenue terms, such that they could fill the shortfall in patient revenue resulting from defendant's conduct and enable Marion and like competitors to remain viable and competitive with SIH, thereby causing harm to competition and consumer welfare; and

i. Enabling SIH to maintain and extend its monopoly in the provision of outpatient surgical services.

155. SIH's tying arrangements have materially and substantially injured Plaintiff Marion HealthCare, L.L.C. surgery center in several ways, including but not limited to the following:

a. Plaintiff Marion HealthCare has been unable to grow its outpatient surgery business;

b. Plaintiff Marion HealthCare has sustained financial damages as a result of Defendant's conduct;

c. Plaintiff Marion HealthCare has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to procure in-network contracts with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West; and

d. The overall business value of Marion HealthCare has decreased because of this exclusionary anticompetitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

# COUNT IV
# TYING ARRANGEMENT
# ILLINOIS ANTITRUST ACT (740 ILCS 10/3)

156.   Plaintiff, Marion HealthCare, incorporates its allegations in paragraphs 1- 132 against SIH as if fully stated herein.

157.   Under the Illinois Antitrust Act, every person [SIH] shall be deemed to have committed a violation of this Act who shall… (2) By contract, combination, or conspiracy with one or more other persons [BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West] unreasonably restrain trade or commerce; or (3) Establish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition or of controlling, fixing, or maintaining prices in such trade or commerce…

158.   SIH has improperly and illegally coerced BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West into entering into agreements that tied discounts for coverage of SIH's inpatient hospital services, including related goods, such as drugs and implants, with exclusive contracting for in-network coverage of SIH's outpatient surgical services, including related goods, such as drugs and implants, thereby prohibiting BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West from contracting for in-network coverage with competing freestanding outpatient surgery centers in the region.  This conduct constitutes a per se illegal tie by SIH.  In the alternative, this conduct is unlawful under the rule of reason.

159.   SIH has monopoly power in the markets for inpatient hospital services and
outpatient surgical services, whether defined as reimbursed by any payors or only by
commercial insurers, in the relevant geographic market.

160.   SIH used its monopoly power in the market for inpatient hospital services to
coerce BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West
to agree not to provide in-network insurance coverage of outpatient surgical services
provided by Marion HealthCare surgery center.  SIH did this by granting the
insurance companies access to discounted rates from SIH for general inpatient
hospital services in return for the insurance companies' agreements to exclude
Marion Healthcare in this manner.

161.   In a competitive market, BlueCross would not have been subject to coercion from
a "must have" inpatient hospital service provider, and would instead have been free to
contract with competing providers of outpatient services so as to reap the benefits of
lower prices, greater access, and higher quality for its insureds needing outpatient
surgical services in the market.

162.   SIH's more than 75% share of the market for acute care inpatient services in the
relevant geographic market gave it the ability to coerce BlueCross, Health Alliance,
GHP, PHCS, HFN, SelectHealth, and Great-West and perhaps others to each agree
not to provide in-network insurance coverage of outpatient surgical services provided
by Marion HealthCare surgery center, thereby, greatly reducing Plaintiff Marion
HealthCare surgery center's ability to serve patients covered with BlueCross, Health
Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West health insurance, and it so

exercised that market power. This improper tying (and exclusive dealing) agreement has substantially enabled SIH to monopolize the outpatient surgical market.

163.    This tie affected a significant volume of business in the outpatient surgical services market and had an anticompetitive effect in the market for outpatient ambulatory surgery services in Williamson and Jackson Counties and the surrounding area. Because BlueCross and Health Alliance are major supplier of commercial health insurance in the region, including employees of the state and federal government, their dependents, and other retirees, the resulting net revenue from treating patients covered by the excluded companies accounts for a significant portion of outpatient surgery services in the Williamson and Jackson Counties and adjacent local area.

164.    SIH's tying arrangements with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West have materially and substantially harmed competition and injured consumer welfare by, among other things:

    a.  Decreasing the number of options available to patients seeking or in need of outpatient surgical services;

    b.  Decreasing the quality of care to patients seeking or in need of outpatient surgical services;

    c.  Substantially raising entry barriers in the outpatient surgical services market;

    d.  Suppressing price competition, thereby increasing the price patients must pay in the geographic market for outpatient surgical services;

    e.  Increasing the price patients and their employers must pay for commercial health insurance;

f.  Raising the barriers to entry and decreasing the potential for entry by new competing entrants into the commercial health insurance market;

g.  Decreasing the potential for entry by new competing surgery centers into the outpatient surgical market;

h.  Substantially foreclosing access of Marion HealthCare and like competitors to patients paying commercially reimbursed fees for services, where patients paying only government-reimbursed (Medicare, Medicaid, TRICARE) fees provide relatively insignificant sources of financial input and are not meaningful substitutes in revenue terms, such that they could fill the shortfall in patient revenue resulting from defendants' conduct and enable Marion and like competitors to remain viable and competitive with SIH, thereby causing harm to competition and consumer welfare; and

i.  Enabling SIH to maintain and extend its monopoly in the provision of outpatient surgical services.

165.  SIH's tying arrangements with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West have materially and substantially injured Plaintiff, Marion HealthCare in several ways, including but not limited to:

a.  Plaintiff Marion HealthCare has been unable to grow its outpatient surgery business;

b.  Plaintiff Marion HealthCare has sustained financial damages as a result of Defendants' conduct;

c.  Plaintiff Marion HealthCare has suffered loss of investment profits in the surgery center as its profitability has dropped as a result of its inability to

procure an in-network contract with BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West; and

d.   The overall business value of Marion HealthCare has decreased because of this exclusionary anticompetitive conduct as a result of a decrease in the company's Earnings Before Interest, Taxes, Depreciation, and Amortization (EBITDA).

### COUNT V
### MONOPOLIZATION
### SHERMAN ACT, SECTION 2 (15 U.S.C. § 2)

166.   Marion HealthCare incorporates its allegations in paragraphs 1-132 against SIH as if fully stated herein.

167.   SIH has monopoly power in the market for outpatient surgical services, whether defined as reimbursed by any payors or only by commercial insurers, in the relevant geographic market.

168.   SIH acted to willfully maintain and extend its monopoly power in the market for outpatient surgical services by using its existing market power as a "must have" inpatient services provider to coerce BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West, and possibly others, into accepting exclusivity provisions with respect to outpatient services, which the insurance companies did not want, in exchange for discounted inpatient services, which the insurance companies required.

169.   The obvious intent and effect of this conduct was to substantially weaken and/or drive competing outpatient service providers, including Marion HealthCare, out of the market, and/or prevent competing facilities from entering the market, due to the

individual and combined market power of the excluded insurances companies as
purchasers of outpatient services in the market.

170.　This conduct, which on independent grounds is also unlawful as exclusive dealing
and tying, constitutes unlawful monopolization under Section 2 of the Sherman Act.

171.　SIH's unlawful monopolization has materially and substantially harmed
competition and injured consumer welfare by, among other things:

    a.　Decreasing the number of options available to patients seeking or in need of
outpatient surgical services;

    b.　Decreasing the quality of care to patients seeking or in need of outpatient
surgical services;

    c.　Substantially raising entry barriers to the outpatient surgical services market;

    d.　Suppressing price competition, thereby increasing the price patients must pay
in the geographic market for outpatient surgical services;

    e.　Increasing the price patients and their employers must pay for commercial
health insurance;

    f.　Raising the barriers to entry and decreasing the potential for entry by new
competing entrants into the commercial health insurance market;

    g.　Decreasing the potential for entry by new competing surgery centers into the
outpatient surgical market; and

    h.　Substantially foreclosing access of Marion HealthCare and like competitors to
patients paying commercially reimbursed fees for services, where patients
paying only government-reimbursed (Medicare, Medicaid, TRICARE) fees
provide relatively insignificant sources of financial input and are not

meaningful substitutes in revenue terms, such that they could fill the shortfall in patient revenue resulting from defendant's conduct and enable Marion and like competitors to remain viable and competitive with SIH, thereby causing harm to competition and consumer welfare.

172.  SIH's unlawful monopolization has materially and substantially injured Plaintiff Marion HealthCare by, among other things:

   a.  Substantially decreasing the surgery center business volume and revenue;

   b.  Substantially decreasing the business value of the company;

   c.  Decreasing the profitability of the business; and

   d.  Foreclosing or greatly decreasing access to potential patients (customers) in need of outpatient surgical services; and increasing Plaintiff's per-patient replacement costs, that is, increasing the number of patients not insured by BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West that Plaintiff will need to try to replace, to compensate for the elimination of patients covered by BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West from the pool of available potential patients.

## VI. REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests:

a)  The Court adjudge and decree that Defendant has acted unlawfully to restrain trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and the Illinois Antitrust Act and has acted unlawfully to maintain and extend a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C., § 2;

b)      Equitable relief from the Court permanently enjoining SIH, its officers, directors, agents, employees, and successors, and all other persons acting or claiming to act on its behalf, directly or indirectly, from seeking, negotiating for, agreeing to, continuing, maintaining, renewing, using, or enforcing, or attempting to enforce exclusionary contracts between SIH and commercial insurance carriers including BlueCross, Health Alliance, GHP, PHCS, HFN, SelectHealth, and Great-West;

c)      Equitable relief from the Court to reform existing contracts to remove the exclusionary provisions, enjoin SIH and its subsidiaries from expanding its ownership of physician medical practices, nurse practitioner practices and physician assistants in the market, and order a restructuring of SIH's organizational structure and health care provider agreements to eliminate its monopoly in the marketplace or other reasonable alternatives;

d)      On Count I, EXCLUSIVE DEALING (Sherman Act):

 i.      compensatory damages

 ii.      treble damages;

 iii.      attorney's fees and costs; and

 iv.      such other and further relief as the Court deems appropriate

e)      On Count II, EXCLUSIVE DEALING (Illinois Antitrust Act):

 i.      compensatory damages

 ii.      treble damages;

 iii.      attorney's fees and costs; and

 iv.      such other and further relief as the Court deems appropriate

f)      On Count III, TYING ARRANGEMENTS (Sherman Act):

       i.      compensatory damages;

       ii.     treble damages;

       iii.    attorney's fees and costs; and

       iv.    such other and further relief as the Court deems appropriate

g)     On Count IV, TYING ARRANGEMENTS (Illinois Antitrust Act) :

       i.      compensatory damages;

       ii.     treble damages;

       iii.    attorney's fees and costs; and

       iv.    such other and further relief as the Court deems appropriate

h)     On Count V, MONOPOLIZATION:

       i.      compensatory damages

       ii.     treble damages;

       iii.    attorney's fees and costs; and

       iv.    such other and further relief as the Court deems appropriate.

## JURY DEMAND

PLAINTIFF RESPECTFULLY DEMANDS TRIAL BY JURY ON ALL ISSUES

TRIABLE AS SUCH.

Respectfully submitted this 17th day of February, 2016,

s/THOMAS J. PLIURA
Thomas J. Pliura,
Attorney for Plaintiff/Lead Counsel
Law Offices of Thomas J. Pliura, M.D., J.D., P.C.
P.O. Box 130
LeRoy, IL 61752
Telephone:  (309)962-2299
Fax:  (309)962-4646

## <u>CERTIFICATE OF SERVICE</u>

State of Illinois            )
                             )
County of McLean        )

      The undersigned attorney states and says that he served the foregoing Document upon the individual(s) listed below via the CM/ECF System:

      For SIH:

          Stephen Wu
          Michelle S. Lowery
          David Marx, Jr.
          McDermott Will & Emery
          227 West Monroe St., Suite 4400
          Chicago, IL  60606

on the 17th day of February, 2016

                  By: <u>s/ Thomas J. Pliura_____</u>
                  Thomas J. Pliura,
                  Attorney for Plaintiff/Lead Counsel
                  Law Offices of Thomas J. Pliura, M.D., J.D., P.C.
                  P.O. Box 130
                  LeRoy, IL 61752
                  Telephone:  (309)962-2299
                  Fax:  (309)962-4646
                  tom.pliura@zchart.com